McCOY, Appellee,

v.

McCOY, Appellant; Majka, Appellant.

[Cite as *McCoy v. McCoy* (1993), 91 Ohio App.3d 570.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63418.

Decided Nov. 15, 1993.

*Zashin, Rich, Sutula & Monastra Co., L.P.A.,* and *John D. Sutula,* for appellee.

*Whiting & Assoc.* and *Herbert R. Whiting,* for appellant Raymond L. McCoy.

*Peter D. Brosse,* for intervening appellant Douglas Majka.

PORTER, Judge.

Defendant-appellant Raymond L. McCoy appeals from the divorce decree entered in the common pleas court on December 30, 1991. He contends that the trial court erred in favor of the plaintiff-appellee Charlotte McCoy in determining the value of Mr. McCoy's interest in a physical therapy partnership for purposes of dividing marital assets, awarding spousal support and attorney fees, and requiring a life insurance policy on Mr. McCoy's life to secure future payments to Mrs. McCoy required by the decree. For the reasons set forth below, we modify and affirm in part on condition and reverse in part.

Mr. and Mrs. McCoy are ages fifty-four and forty-nine respectively. The court found them both in good health, emotionally and physically. Both are college graduates. They married in 1964 and had two children who are now adults. Six months after the marriage, plaintiff received her bachelor's degree in home economics. Ten months after the marriage, defendant received his physical therapy certificate. Defendant was originally engaged as a partner in a physical

therapy practice on the east side of Cleveland, but left that partnership in 1968. He founded Raymond L. McCoy Physical Therapy, n.k.a. McCoy Physical Therapy Associates ("the therapy business"), in Parma with marital funds. The family moved to the west side of Cleveland in 1969. In 1971, the business expanded to two clinics through the purchase of a private physical therapy practice in Lakewood. In 1976, defendant was contacted by a group of doctors to open a new clinic in Middleburg Heights and, as a result, he hired Douglas Majka as an employee. Majka intervened in the divorce proceedings with leave of court. In the early 1980s, another private practice in Brunswick was purchased and a second Lakewood office was opened. At the time of trial, there were four branch clinics, two managed by Mr. McCoy and two managed by Majka.

In 1978, Majka's compensation method changed and he began to receive a twenty-five percent share of profits, later thirty-five percent and by 1983, he was sharing in the profits of the therapy business to the extent of forty-five percent. Since that time, Mr. McCoy and Majka have shared the profits approximately fifty-five percent to forty-five percent as shown by the schedule below reflecting the information from Schedule C, Form 1040, and displayed in Plaintiff's Exhibit 65, as follows:

|  | McCOY | MAJKA | McCOY | MAJKA |
|---|---|---|---|---|
| 1988 | $ 418,500 | $ 335,800 | 55.48% | 44.52% |
| 1987 | $ 361,400 | $ 301,100 | 54.55% | 45.45% |
| 1986 | $ 297,000 | $ 268,100 | 52.56% | 47.44% |
| 1985 | $ 236,800 | $ 215,200 | 52.32% | 47.68% |
| 1984 | $ 228,500 | $ 175,100 | 56.62% | 43.38% |
| 1983 | $ 172,000 | $ 160,400 | 51.74% | 48.26% |
| TOTALS: | $1,714,200 | $1,456,300 | 54.1% | 45.9% |

Mr. McCoy and Majka, however, never filed partnership tax returns, Form 1065. The McCoys always filed an IRS Form 1040 Schedule C to report the business income as a sole proprietorship, as did Majka for his share of the business. Majka received IRS Form 1099 to report his earnings. The McCoys and Majka used the same accountant, but each party met separately with the accountant.

Mrs. McCoy never worked outside the family physical therapy business except as a part-time church organist. She served as a part-time office manager of the therapy business since its inception in 1968, but never earned more than $5,400 per year in the six years prior to the trial. She kept the records and performed the banking, billing, collection, bookkeeping, and other clerical and financial responsibilities of the business supervised by defendant. The parties established a business office at the marital home so that Mrs. McCoy could better coordinate these tasks for all the clinics while raising the parties' two minor children. Defendant supervised the entire physical therapy operation and directly managed

the Parma and Lakewood clinics. He worked sixty to seventy hours a week. This effort resulted in the McCoys' receiving annual income of $420,000 for 1990.

During their twenty-seven years of marriage, the parties enjoyed a high standard of living. They travelled frequently, including trips to Europe, the Caribbean and Florida. Mrs. McCoy testified to using a back brace for the fifteen years before trial.

Mrs. McCoy offered evidence that Majka held no ownership interest in the business, did not buy into the business and was an independent contractor. Messrs. McCoy and Majka offered evidence that they were in a "hand-shake" partnership since 1978, and that Majka had bought into the business and that since 1983 the partnership was fifty-five percent owned by McCoy and forty-five percent by Majka. The trial court found that the business was a partnership between defendant and Majka, having a total value of $2,934,230, the exact amount to which Mrs. McCoy's expert appraiser testified. The court found that defendant's share of the business was valued at $2,000,000, which it held to be a marital asset. The court offered no explanation or rationale for selecting $2,000,000 as the value of Mr. McCoy's interest.

We will address defendant's assignments of error in the order asserted:

"I. The trial judge erroneously fixed the value of Raymond L. McCoy and Associates Physical Therapy at a grossly excessive sum not supported by the evidence and contrary to the manifest weight of the evidence.

"II. The trial judge's $2,000,000 valuation of appellant's interest in Raymond McCoy and Associates is supported by no evidence whatever. It is an arbitrary and capricious abuse of the trial judge's discretion."

These two assignments of error will be treated together as they involve essentially the same issue—whether there was sufficient evidence to justify the court's valuation of Mr. McCoy's interest in the therapy business. At the outset, we are guided by the recognition that "an appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court." *Myers v. Garson* (1993), 66 Ohio St.3d 610, 616, 614 N.E.2d 742, 746.

Mrs. McCoy contended that the therapy business was a sole proprietorship, owned by Mr. McCoy and therefore a one-hundred percent marital asset. Mr. McCoy argued at trial that the therapy business was a partnership in which Mr. McCoy owned fifty-five percent and Majka owned forty-five percent. It is this dispute which generated a $2,000,000 valuation by the court of Mr. McCoy's interest in the business. This valuation substantially affects the division of marital property which the court made. The court found the therapy business

was worth $2,934,230 in total but found Mr. McCoy's share to be $2,000,000 (*i.e.*, 68.16 percent of the $2,934,230). Whereas, if Mr. McCoy's contention is correct, *i.e.*, that he only owns fifty-five percent of the partnership business, the value attributable to him (fifty-five percent × $2,934,230) equals $1,613,826, a significant difference. As noted, the trial court did not explain how or why it arrived at the $2,000,000 figure representing Mr. McCoy's share.

The matter of sole proprietorship versus partnership is further complicated by the fact that the trial court did find, without explanation, that Mr. McCoy and Majka were partners. Judgment Entry at 13. The evidence showed that the partners since 1983 had split the net profits of the therapy business—fifty-five percent to Mr. McCoy and forty-five percent to Majka—and that they split the management and supervisory duties of the four clinic branches equally. However, there was no written partnership agreement and for income tax purposes, Mr. McCoy and Majka each reported his income on a Schedule C, Form 1040 and did not file a partnership return.

Mr. McCoy's major contention is that Mrs. McCoy's expert appraiser, Professor Harvey Rosen, grossly overvalued the therapy business in fixing its total value at $2,934,230. McCoy assigns two major mistakes by Professor Rosen: (1) he underestimated the annual salary replacement cost for Mr. McCoy and Majka by assuming $75,000 each for Mr. McCoy and Majka, which was roughly twice the going rate for an average therapist ($37,454); and (2) he gave full credit to $765,000 in accounts receivable, some of which allegedly had been on the books for twenty years, for which no bad-debt reserve or aging analysis had been made. According to Mr. McCoy, the product of these two miscalculations led to the grossly inflated value of the total business. Mr. McCoy's appraisal experts, Lawrence M. Davies and David Cook (Coopers & Lybrand), found the market value of the whole business to be $1,882,000 AND $1,550,000, respectively, including the book value of accounts receivable.

We start with the proposition that we must defer to the trial court as the finder of fact. A court of appeals is "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. The court's explanation for this ruling stated:

"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. * * *

" 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " (Citations omitted.) *Id.* at 80, 10

OBR at 410–411, 461 N.E.2d at 1276.  With our limited scope of review in mind, we address the valuation issues raised by Mr. McCoy.

Although considerable latitude must be given to expert testimony where appraisal of a closely held business is involved, the testimony nonetheless must have a rational basis and not depend merely on the conclusion of the expert witness.  "An expert may not offer an opinion which embraces the 'ultimate issue' if that opinion is essentially a bare conclusion significantly lacking in supporting rationale."  *Gannett v. Booher* (1983), 12 Ohio App.3d 49, 52, 12 OBR 190, 194, 465 N.E.2d 1326, 1332.  We find that the testimony of plaintiff's appraiser as to the determination of the replacement costs of the managerial talent of the business (Mr. McCoy and Majka) was unreasonably low and arbitrarily set at $75,000 each.  The citation for Rosen's conclusion was U.S. News & World Report, June 12, 1989, page 67, which stated:

"The percent of physical therapists who work for themselves earn an average of about $73,000 compared with 32,000 for those in salaried positions according to a 1987 study by the American Physical Therapy Association."

This is not adequate support for the appraiser's conclusion.  There is no sound basis for simply assuming that the manager of a multi-branch physical therapy business is reasonably compensated at the same average salary of a routine physical therapist in business for himself.  This is especially true when the appraiser in question (in this case, Rosen) has had no previous experience in evaluating physical therapy or rehabilitative service operations and made no effort to develop "comparables" in the market area.  In the case at bar, the highly successful nature of the business clearly depended on the skills of Mr. McCoy and Majka as "managers," not as "hands-on" physical therapists.  The client base of the partnership relied almost exclusively on referrals from physicians and local medical clinics.  Mr. McCoy and Majka are responsible for maintaining and cultivating those client referrals.  In 1990, they earned $420,000 and $320,000, respectively, for their efforts.  In short, we find that the managerial replacement cost used in the Rosen evaluation and accepted by the court was not supported by competent or credible evidence.

Defendant's appraisal expert, Lawrence M. Davies, testified from his analysis of the four clinics' operations and every phase of the business.  He found that the annual replacement cost of the executive and managerial talent of Mr. McCoy/Majka was $367,454: $175,000 for Mr. McCoy alone; $155,000 for Majka; and $37,454 for a third person, since he found it would take three managers to replace the skills and energies of Mr. McCoy and Majka.  Davies has been in the health care business since 1984.  As a financial analyst, he valued and negotiated thirty to thirty-five acquisitions in the health care field and more recently valued thirty-five rehabilitation services companies engaged in out-patient practice.  We

find Davies's replacement cost values to be far more realistic and based on reasonable economic principles and current experience.

As pointed out by defendant, the effect of undervaluing the replacement costs of the managers had a substantial impact on the total value of the business. Since Rosen used a factor of five (or twenty percent) times the annual excess earnings (cash flow) to reach his $2,934,230 total business value, the difference between his managerial replacement cost ($150,000) and that of defendant's expert ($367,454) is $217,454 × 5 = $1,087,270. This reflects a prospective liability substantially reducing the total value of the therapy business if McCoy and Majka are replaced by comparable quality managers to maintain the stream of business.

Defendant also contends that Rosen's failure to audit the $765,000 in accounts receivable rather than simply accepting them at book value also led to an inflated value for the business. Rosen did not inquire into the aging or collectibility of these accounts, some of which had been on the books for twenty years. Mrs. McCoy was the bookkeeper for the business. She testified that uncollectible or aged accounts receivable had been "weeded out." There were no reserves for bad debts or provisions for uncollectibility on the books for these accounts. Nevertheless, it appears that defendant's expert appraisers accepted the same $765,000 value for the accounts receivable and we cannot say it was without any credible support in the record.

Putting aside the physical therapy business for the moment, the balance of the marital assets, consisting mostly of real estate, bank accounts and investments, were divided $1,298,130 to Mrs. McCoy and $736,712.90 to Mr. McCoy. Many of these were stipulated by the parties. Then the court attributed $2,000,000 to the value of the physical therapy business of Mr. McCoy but required him, as a division of property, to pay $725,041 to Mrs. McCoy for a period of ten years at ten percent interest in equal monthly installments of $9,581.50 or $114,978 per year. Thus, the court roughly divided the marital assets fifty-fifty, i.e., if the total marital assets were valued at $4,053,482, as found by the court (Journal Entry at 6). Under the decree, Mrs. McCoy was to receive $1,298,130 plus $725,041 = $2,023,171. Mr. McCoy was to receive $736,712 plus $1,274,959 ($2,000,000 minus $725,041) = $2,011,671. This superficially effects an approximately equal division of marital property consistent with R.C. 3105.171(C)(1). But that is true only if Mr. McCoy's partnership interest in the business was worth $2,000,000.

However, we find that the evidence does not support the valuation that the court assigned to the therapy business. It was not economically reasonable to find on this record that the combined services of Messrs. McCoy and Majka were only worth $150,000 per year given the history of this business.

Since the court found that Mr. McCoy and Majka were partners and all evidence points to a sharing of profits in the business—fifty-five percent to Mr. McCoy and forty-five percent to Majka—we also find it was against the weight of the evidence to hold, as the court did, that Mr. McCoy's interest in the business was 68.16% of its total value, or $2,000,000 of $2,934,230.

We also find support for our reasoning herein in a recent case by the Eleventh District Court of Appeals in *Rodriguez v. Rodriguez* (Apr. 13, 1990), Geauga App. No. 89–G–1498, unreported, 1990 WL 47458, which was faced with a similar situation involving the valuation of a closely held business in the division of marital assets. The court stated as follows:

"However, in obtaining a valuation, the judge or trier of fact must have before it sufficient evidence to justify or support the dollar figure it obtains. This court in *Bollas v. Bollas* (Dec. 1, 1989), Trumbull App. No. 88–T–4089, unreported [1989 WL 146420], citing from *Bushman v. Bushman* (Mar. 31, 1989), Geauga App. No. 1442, unreported, noted 'that the availability of testimony, in the trial court record, which purports to value property, is not a panacea for failure to specifically enumerate valuations in the entry. An appellate court cannot glean from the record the trial court's estimation of the credibility of the witnesses' valuation testimony unless the trial court provides the answer in the entry.' *Bollas,* at 4. Similarly, if the trial court summarily arrives at a valuation of an asset or property, even though between the two extremes of the opposing parties' witnesses, without a proper evidential predicate, such would be error. Even though the trier of fact is granted much leeway in obtaining a value, it must do so based upon the evidence before it. To achieve a middle of the road estimation without some basis for such an adjustment from one extreme or the other would constitute error as not being supported by the evidence.

"In this cause, appellant's expert valued the business at $51,257. Appellee's expert indicated it was worth $280,586. The remaining testimony is insufficient to support a finding of $125,000. Neither party presented evidence which would either increase the value by approximately $75,000 or decrease the value by $155,000. Furthermore, the court failed to explain how it obtained the value it did. Therefore, the court's conclusion is not supported by any evidence which would permit a valuation of $125,000." *Id.* at 4–5.

Although the trial court, in the instant case, found a value of the entire partnership business to be $2,934,230 as opined by Mrs. McCoy's expert, there was absolutely no rationale articulated by the court or evidence in the record which would support a valuation of Mr. McCoy's interest at $2,000,000. "Therefore, the court's conclusion is not supported by any evidence which would permit a valuation of [$2,000,000]." *Rodriguez, supra.*

■ It is not this court's prerogative to fix the value of the therapy business or to determine in the first instance the appropriate division of marital property. Nevertheless, we have determined that the award of marital property to the plaintiff was excessive stemming from an overvaluation of Mr. McCoy's interest in the partnership as discussed above. We must consider a proper disposition of the case which will serve the interest of justice and the parties while effecting judicial economy. This court has the same power to order a remittitur as does the trial court. *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph five of the syllabus; *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 162, 2 OBR 704, 705, 443 N.E.2d 184, 186. It is not necessary that the excess to which the remittitur is addressed be susceptible of exact computation. *Schendel v. Bradford* (1922), 106 Ohio St. 387, 140 N.E. 155.

Therefore, this court modifies and affirms the award of marital property below upon condition that the appellee accepts a remittitur from $725,041.44 to $435,480 with respect to appellee's share in Mr. McCoy's interest in the therapy business. Appellee shall have ten days from the announcement of this decision to file an acceptance of this remittitur, payable over a period of ten years in equal monthly installments with interest at ten percent. If appellee refuses or fails to accept the remittitur within the time allotted, the judgment below as to the division of marital property only is reversed and remanded to the trial court for a new trial solely on the issue of the division of marital property consistent with the principles enunciated in this opinion.

These assignments of error are sustained in part and overruled in part.

"III. On the evidence the trial judge's award of spousal support was arbitrary, capricious and an abuse of discretion."

■ The defendant claims the plaintiff is entitled to no award of spousal support in view of the other generous conditions of the decree. The court "found from the evidence that plaintiff's needs for spousal support is [*sic* ] $95,227 per year" (Judgment Entry at 6), the exact amount specified by plaintiff's expert financial planner for cost of living expenses. The court ordered spousal support of $75,000 per year for a period of eight years payable in monthly installments of $6,250 per month, "subject to the death, remarriage, or cohabitation of Plaintiff, subject to the continuing jurisdiction of the Court * * *." Judgment Entry at 12. We find no error in this award.

"In Ohio, alimony consists of two components: a division of marital assets and liabilities, and periodic payments of sustenance and support. *Kaechele v. Kaechele* (1988), 35 Ohio St.3d 93, 95, 518 N.E.2d 1197, 1200. As part of a divorce proceeding, a trial court has equitable authority to divide and distribute the marital estate, and then consider whether an award of sustenance alimony would

be appropriate. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 541 N.E.2d 597; R.C. 3105.18(A).

"Courts in this state derive their power to award sustenance alimony from the statutes. R.C. 3105.18(A) and (B) provide a trial court with guidelines for determining whether alimony is necessary and the nature, amount and manner of alimony payments. *Wolfe v. Wolfe* (1976), 46 Ohio St.2d 399, 414, 75 O.O.2d 474, 482, 350 N.E.2d 413, 423. The trial court is provided with broad discretion in deciding what is equitable upon the facts and circumstances of each case, but such discretion is not unlimited. *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, 355, 20 O.O.3d 318, 322, 421 N.E.2d 1293, 1299. A reviewing court cannot substitute its judgment for that of the trial court unless, considering the totality of the circumstances, the trial court abused its discretion. *Holcomb, supra* [44 Ohio St.3d], at 131, 541 N.E.2d at 599. As we noted in *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142, for an abuse of discretion to exist, the court's attitude must be unreasonable, arbitrary or unconscionable and not merely an error of law or judgment." *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 67, 554 N.E.2d 83, 86–87.

■ Accordingly, in this case we must examine the trial court's ruling under the totality of the circumstances and determine whether it acted unreasonably, arbitrarily, or unconscionably.

Concerning an award of alimony, R.C. 3105.18 provides:

"(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

"(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

"(b) The relative earning abilities of the parties;

"(c) The ages and the physical, mental, and emotional conditions of the parties;

"(d) The retirement benefits of the parties;

"(e) The duration of the marriage;

"(f) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;

"(g) The standard of living of the parties established during the marriage;

"(h) The relative extent of education of the parties;

"(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

"(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

"(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

"(l) The tax consequences, for each party, of an award of spousal support;

"(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

"(n) Any other factor that the court expressly finds to be relevant and equitable.

"(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income."

Mr. and Mrs. McCoy were married for twenty-seven years. Their two children are now adults. Mrs. McCoy contributed substantially to the marriage both as a mother and homemaker as well as working part-time in the physical therapy business as the business manager and bookkeeper for which she never received more than $5,400 per year. She also earned $4,000 per year as a church organist.

Mr. and Mrs. McCoy enjoyed a very comfortable life style, including gracious homes, country clubs and extensive travel and entertainment. In 1990, Mr. McCoy earned $420,000 from the physical therapy business and his income has shown steady growth over the years. Mrs. McCoy is accustomed to a high standard of living commensurate with Mr. McCoy's business success, to which she contributed for many years.

Mrs. McCoy has a master's degree in family therapy, is an accomplished artist, plays golf, takes dancing lessons and enjoys ballroom dancing several times a week with a gentleman friend. Although defendant argues that Mrs. McCoy should be able to contribute $30,000 per year from her own employment and complains that the court made no allowance in determining support for Mrs. McCoy's employment opportunities, we cannot say it erred in doing so. Mrs. McCoy's efforts to find work as an assistant hospital administrator have been unsuccessful. Whether she would ever be able to find meaningful employment is problematic, since she devoted most of her time and adult life to running the bookkeeping side of her husband's therapy practice. It is unlikely in today's

market that there is a significant demand for bookkeeping services of the nature she performed. In any event:

"R.C. 3105.18(B) neither imposes a duty to seek employment nor makes failure to seek employment a determinative factor to be considered. Rather, the factor to be considered concerning employment is '[t]he relative earning abilities of the parties.' Nor is failure to seek employment otherwise independently a determinative factor. In this regard, the relevant and determinative factor is 'earning ability.'" *Haninger v. Haninger* (1982), 8 Ohio App.3d 286, 288, 8 OBR 380, 382, 456 N.E.2d 1228, 1231; *Boland v. Boland* (Mar. 25, 1993), Cuyahoga App. Nos. 61721 and 61733, unreported.

We note that the court properly retained jurisdiction to modify the spousal support in view of a "change of circumstance" pursuant to R.C. 3105.18(E) and (F).

Although the spousal support award is generous, we cannot say, under the circumstances, that it is against the manifest weight of the evidence given Mr. McCoy's substantial income; nor do we find the award was an abuse of discretion. It will be affirmed. This assignment of error is overruled.

"IV. The trial judge's gratuitous order granting appellee additional support in the form of $1,749,780 life insurance is unsupported by evidence, is arbitrary and capricious and an abuse of discretion."

■ The trial court ordered that the "Defendant shall secure the unpaid portion of property settlement, spousal support and attorney fees by procuring insurance on his life with Plaintiff as irrevocable first beneficiary." (Judgment Entry at 12.) Plaintiff apparently did not request this security provision; nor was it an issue between the parties as it seems to have been granted *sua sponte* by the court without notice or discussion. Defendant argues there is no evidence he could obtain such a policy or what the premium would be, nor was there any evidence it is necessary. Spousal support terminates upon the death of either party under R.C. 3105.18(B) "unless the order containing the award expressly provides otherwise." The decree herein does not so provide. Therefore "security" in the form of life insurance is inappropriate for spousal support payments. *Keating v. Keating* (June 17, 1993), Cuyahoga App. Nos. 63885 and 64943, unreported, 1993 WL 215446. We find the insurance provision for spousal support is unwarranted and reverse that portion of the award as an abuse of discretion.

■ The life insurance policy is proper as security for the division of property settlement award (as finally determined) and attorney fees. See *Nori v. Nori* (1989), 58 Ohio App.3d 69, 568 N.E.2d 730; *Gore v. Gore* (1985), 27 Ohio App.3d

141, 27 OBR 173, 499 N.E.2d 1281. That portion of the award is affirmed. This assignment of error is sustained in part and overruled in part.

"V. The trial judge's order to pay additional spousal support to cover appellee's legal expense is unconscionable, arbitrary and capricious."

■ Defendant challenges the award of attorney fees in the sum of $96,000. Mrs. McCoy requested $100,000. Under the circumstances of this vigorously contested case, we cannot say the trial court erred.

■ An award of alimony may be made in the form of an allowance for reasonable attorney fees. *Swanson v. Swanson* (1976), 48 Ohio App.2d 85, 89, 2 O.O.3d 65, 68, 355 N.E.2d 894, 897. Consideration must be given to the reasonableness of the fee award and to the criteria used in the granting of an alimony award. *Id.* at 90, 2 O.O.3d at 68, 355 N.E.2d at 898. On appeal, the only questions for inquiry are whether the factual conclusions upon which the trial court based the exercise of its discretion were against the manifest weight of evidence, or whether there was an abuse of discretion. *Id.; Oatey v. Oatey* (1992), 83 Ohio App.3d 251, 263, 614 N.E.2d 1054, 1061; *Birath v. Birath* (1988), 53 Ohio App.3d 31, 39, 558 N.E.2d 63, 71.

The *Swanson* court further referred to DR 2–106(B) of the Code of Professional Responsibility, which provides the following guidelines for determining the reasonableness of a fee:

" '(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

" '(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

" '(3) The fee customarily charged in the locality for similar legal services.

" '(4) The amount involved and the results obtained.

" '(5) The time limitations imposed by the client or by the circumstances.

" '(6) The nature and length of the professional relationship with the client.

" '(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

" '(8) Whether the fee is fixed or contingent.' " See *Swanson,* 48 Ohio App.2d at 90–91, 2 O.O.3d at 68–69, 355 N.E.2d at 898.

Further, the *Swanson* court cautioned that:

"[T]he initial overriding consideration is the financial ability of the individual in question to meet the demands of any award. See *Rivers v. Rivers* (1968), 14 Ohio App.2d 120 [43 O.O.2d 277, 237 N.E.2d 164]. Not only must the award be within

the individual's ability to pay, but it must also leave that individual the means to maintain his own health and well-being by obtaining proper food, shelter and clothing, and it must not burden him to the extent his incentive to pay is destroyed. *Blaney v. Blaney* (Iowa 1964) [256 Iowa 1151], 130 N.W.2d 732, 733. See *Coleman v. Coleman* (Mo.App.1958), 318 S.W.2d 378." *Id.*, 48 Ohio App.2d at 95, 2 O.O.3d at 71, 355 N.E.2d at 901.

The trial court must make a factual determination as to the reasonableness of the fees charged by a party's counsel. The reasonableness of the fees is tested by the Disciplinary Rule factors set forth in *Swanson, supra.* R.C. 3105.18(H) and Dom.Rel.Loc.R. 21(A). A trial court is precluded from making the required factual determination when the party, through his or her attorney, provides no evidence to the court showing the nature of the services rendered, the difficulty of the services performed, or any other information required by *Swanson.* See *Braun v. Braun* (Oct. 18, 1984), Cuyahoga App. No. 47960, unreported. That was not the case below. Here, plaintiff's counsel offered itemized evidence of the services rendered, the difficulties encountered and the reasonableness of the work and the hourly rates charged. This was supported by expert testimony of an experienced domestic relations practitioner.

We find no error of law or abuse of discretion in the court's award of $96,000 in attorney fees as part of spousal support.

This assignment of error is overruled.

*Judgment modified*
*and affirmed in part on condition,*
*and reversed in part.*

KRUPANSKY, J., concurs.

PATTON, P.J., dissents.

PATTON, Presiding Judge, dissenting.

It is my reasoned opinion that this matter should be reversed and remanded to the trial court for a new trial solely on the issue of the division of marital property. I do not agree with the majority's proposal that the appellee accept a remittitur from $725,041.44 to $435,480 with respect to appellee's share in Mr. McCoy's interest in the therapy business.

Based on the complexity and contradictory testimony of the experts below, I do not believe it is for this court to determine the valuation of Mr. McCoy's interest in the therapy business. Such a determination should be made by the trial court on remand. I would, therefore, reverse and remand for a new trial on this issue together with the associated issues of the division of marital property.