DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, following entry of judgment in this divorce case. For the reasons stated herein, this court affirms the judgment of the trial court.
Appellant/cross-appellee, Frank E. Barone, sets forth the following assignment of error:
 "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE IN DETERMINING THE VALUE OF APPELLANT'S INTEREST IN HIS MEDICAL PRACTICE, AND IN ORDERING A PROPERTY DIVISION BASED ON AN ERRONEOUS VALUATION OF THAT INTEREST."
Appellee/cross-appellant, Charisse M. Barone, sets forth the following assignment of error:
 "THE TRIAL COURT ERRED IN ORDERING THE APPELLANT/DEFENDANT, FRANK E. BARONE (SIC) TO ONLY PAY A PORTION OF THE APPELLEE/PLAINTIFF/ CROSS-APPELLANT'S ATTORNEY FEES."
The following facts are relevant to the issues raised in this appeal. The parties were married on October 6, 1984. Three children were born as issue of the marriage: Jeffrey (d.o.b. September 21, 1985); Joseph (d.o.b. July 17, 1987); and Francesca (d.o.b. June 19, 1992).
On January 18, 1996, appellee filed a complaint for divorce. Appellant filed an answer and counterclaim on February 15, 1996. The case was tried on August 27 and 29, 1997. The trial court filed its decision on May 13, 1998, and its judgment entry entering divorce on August 18, 1998. Appellant filed a timely notice of appeal.
At trial, appellant testified that he and Dr. Colville have practiced together since approximately 1993 and that their practice is called Reconstructive Aesthetic Surgeons, Inc. ("RAS"). Appellant and Dr. Colville are each fifty percent owners of the corporation. Each doctor's monthly income is set separately and although they pay their own nurses and some individual expenses, they share certain other expenses.
Appellant testified that he and Dr. Colville try to estimate the amount of salaries that would allow RAS to function and pay its expenses; any money left over at the end of the year would be considered bonuses. On cross-examination, appellant admitted that he estimated his monthly income to be $28,084 on a 1996 loan application although he admitted that the amount of the monthly salary he has established is approximately $25,000. Federal tax returns for 1995 and 1996 indicate appellant's annual salary to be $369,881 and $290,966, respectively. Appellant admitted that his income had increased from 1992 to 1993; that his income had increased from 1993 to 1994; and that his income had increased from 1994 to 1995. Appellant explained that the decrease in his income from 1995 to 1996 was related to Operation Smile work, back problems and divorce related matters.
The corporate federal tax returns indicate gross receipts for 1995 and 1996 for RAS as $1,408,933 and $1,490,426, respectively. Appellant also testified that his percentage of non-insured patients is higher than Dr. Colville's because of his work with Operation Smile which does take him out of the state or country two to three weeks per year. RAS also generates income from a skin care clinic run by nurses, the profits of which are split fifty-fifty between appellant and Dr. Colville after expenses.
At trial, each party presented an expert witness in regard to the value of appellant's interest in his medical practice. The valuations were approximately forty-seven percent apart. Each expert conducted his calculations based upon tax returns for RAS and appellant as well as other financial data from appellant's accountant. Neither expert personally observed the physical assets.
Appellee called Garth M. Tebay, a certified public accountant and a certified valuation analyst; the parties stipulated that he was qualified to testify as an expert. Tebay testified as to the records and documents of RAS upon which he based his valuation. Tebay testified that he used guidelines for evaluating medical practices from the American Medical Association ("AMA"). His conclusion was based upon his consideration of the value of the assets, both the fixed assets, the accounts receivable and goodwill. In regard to goodwill, Tebay computed the goodwill using seven different methods, which yielded a range of $295,000 to $578,000; he concluded the goodwill factor of RAS to be $350,000.
Tebay evaluated the fixed or tangible assets to be worth $194,705. Tebay used the AMA guidelines which provide a table to evaluate the estimated fair market value for medical practice equipment and the list of tangible equipment and furniture from the accountant for RAS. In regard to accounts receivable, Tebay calculated a value based upon the accounts receivable for RAS; he testified that he looked at the corporation as a whole which is the normal approach when determining the fair market value of a fifty percent interest in a corporation. Tebay also testified that one of the major differences between his approach, fair market value, and appellant's expert's approach, intrinsic value, was that his approach looked at the value of RAS and then calculated appellant's interest in RAS.
Tebay calculated the sum of the fixed assets, the accounts receivable and goodwill to be $800,000. Although Tebay testified that a thirty-five percent discount rate is the "average" used due to the non-marketability of an interest in a closed corporation, he used a fifteen percent discount rate. He concluded that the fair market value of appellant's fifty percent interest in RAS to be $340,000.
Appellant called Michael Heaton, a certified public accountant; the parties stipulated that he was qualified to testify as an expert. Heaton used the "intrinsic" value method to generate the value he prepared; one of the fundamental components of his valuation is the evaluation of appellant's income stream. This income approach utilizes an analysis of historic cash flows to quantify the goodwill of the practice. To evaluate the goodwill component of appellant's interest in RAS, Heaton used an excess earnings method. The excess earnings method is calculated based upon earnings in excess of some "norm." He used a norm from information provided in the Medical Group Management Association ("MGMA") annual production and compensation survey; the MGMA is a national organization of managers of medical practices. Thus, Heaton compared appellant's income to that of other plastic surgeons. After this comparison of income, either excess or deficit for each year from 1993 through 1996, Heaton applied a weighted average and determined that appellant's interest in the goodwill of RAS was $61,482. Heaton valued the accounts receivable at $107,225, using an approximately seventy-four percent collection rate based upon the approximate collection rate realized by appellant in the first six months of 1997 on the gross accounts receivable of $143,849; Heaton used only appellant's accounts receivable because of the intrinsic value methodology.
Heaton valued the fixed assets using the net book value or a tax basis/tax incentive evaluation. Under this tax approach, small corporations can write off assets one hundred percent even though the value of the asset is not zero. The net book value results when all liabilities have been satisfied from the value of the assets. Heaton calculated the net book value of the tangible assets to be a $7,082 deficit. Heaton concluded the value of appellant's fifty percent interest in RAS to be $161,625.
On cross-examination, Heaton admitted that when he used the MGMA figures for the "norm," he used the national survey data as opposed to the Midwest data; he further admitted that the national average was $272,761 whereas the Midwest average was $219,000. Heaton admitted that had he used the Midwest data, the intangible value and, therefore, the goodwill value, would have been increased because there would have been more excess earnings; he admitted that it was a "judgment" call as to which survey to use. He also admitted that the actual cost of the furniture and fixtures were $152,227; the actual cost of the medical equipment was $18,402; and the actual cost of leasehold improvements were $49,706. Heaton admitted that he used net book value and not fair market value after depreciation to value these assets. Heaton also admitted that appellant's income had exceeded Dr. Colville's every year from 1993 until the divorce was filed in January 1996.
In its decision, the trial court determined the value of appellant's interest in RAS to be $260,000. The trial court selected appellee's expert's valuation of RAS, $800,000, but applied the average rate for discount for non-marketability, thirty-five percent, rather than the fifteen percent discount used by appellee's expert.
The standard of review for appellant's assignment of error is abuse of discretion. Martin v. Martin (1985),18 Ohio St.3d 292, 294. Furthermore, "[t]he trial court has broad discretion to develop some measure of value" and such valuations of marital assets will not be reversed absent an abuse of discretion. Goode v. Goode (1991), 70 Ohio App.3d 125, 132. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. (Citations omitted). When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. In re Jane Doe 1 (1990),57 Ohio St.3d 135, 137-138; Evicks v. Evicks (1992), 79 Ohio App.3d 657,664-665.
In his assignment of error, appellant argues that the trial court erred in its evaluation of the value of his interest in his medical practice. This court finds no merit in this assignment of error.
Specifically, appellant argues on appeal that the trial court erred in its use of a fair market value[2] for appellant's interest in RAS. Appellant argues that there is no "market" for appellant's interest in his own practice and, therefore, this figure should not have been used by the trial court in valuing appellant's interest in RAS.
R.C. 3105.171, which governs property distribution, expresses no specific way for the trial court to determine valuation. Focke v. Focke (1992), 83 Ohio App.3d 552, 554.
Thus, an appellate court will uphold "a trial court's determination of valuation which is based upon competent, credible evidence absent a showing of an abuse of discretion." _Moro v.Moro (1990), 68 Ohio App.3d 630, 637 (citations omitted).
Additionally, as noted by the appellate court inJosselson v. Josselson (1988), 52 Ohio App.3d 60, 63, although a professional license is not marital property, a professional business "may be evaluated as any other business." See, also,Frost v. Frost (1992), 84 Ohio App.3d 699, 714, motion to certify overruled in (1993), 66 Ohio St.3d 1489 (law practice);Turner v. Turner (1993), 90 Ohio App.3d 161, motion to certify overruled in (1994), 68 Ohio St.3d 1430 (surgical practice). Although appellant argues that, in terms of goodwill, there is no market as his services and reputation should not be treated as a business asset because these items cannot be transferred to another through the sale of the business, the Ohio Supreme Court has recognized goodwill as an asset in the valuation of a professional practice. Spayd v. Turner, Granzow Hollenkamp
(1985), 19 Ohio St.3d 55, 62-63.
Goodwill is a divisible marital asset which is distinguishable from future earning capacity. Baldwin's Ohio Domestic Relations Law (1992) 291, T 12.13(B); Kahn v. Kahn
(1987), 42 Ohio App.3d 61, 63. As stated by the Ohio Supreme Court in Spayd v. Turner, Granzow Hollenkamp (1985),19 Ohio St.3d 55, 62-63:
 " * * * we hold that where the evidence established that a professional partnership, * * * , has generated measurable goodwill, it is not against public policy to include that amount of goodwill as an asset upon the dissolution of the business.
" * * *
 " * * * Future earning capacity per se is not goodwill. However, when that future earning capacity has been enhanced because reputation leads to probable future patronage from existing and potential clients, goodwill may exist and have value. When that occurs the resulting goodwill is properly subject to equitable distribution. (Citation omitted.)"
In the case sub judice, the trial court was presented with extensive evidence from each expert witness regarding the valuation of appellant's medical practice. The trial court had before it competent, credible evidence as to possible valuations and was in the best position to determine the credibility of the expert witnesses. The fact that the trial court accepted the valuation set forth by appellee's expert does not automatically render such decision arbitrary or unconscionable. The trial court did not abuse its discretion in failing to adopt the valuation of appellant's medical practice as offered by appellant's expert.
Appellant also argues in his assignment of error that the trial court erred in accepting appellee's expert's treatment of accounts receivable when calculating the value of RAS to determine appellant's fifty percent interest. Appellant argues that appellee's expert was wrong to include both surgeons' accounts receivable in his calculations of the value of RAS because they are independent practitioners. This court does not agree.
In his report, appellee's expert explained that, in arriving at a value for RAS, "The theoretical premise is that the total estimated value of the business is the sum of the values of the adjusted net tangible assets and the value of the intangible assets or goodwill." Appellee's expert utilized a methodology which evaluated the total value of RAS and then calculated the fair market value of appellant's interest.
At oral argument, appellant also argued that the trial court erred in "double-counting" of his income, once for spousal support and, by inclusion of his historical stream of income in the valuation of RAS, also for the division of property.
However, other Ohio appellate courts have considered this argument and have rejected it. See, Kahn v. Kahn (1987), 42 Ohio App.3d 61,63 ("A court may consider both future earnings capacity and professional goodwill without being accused of considering exactly the same assets twice."); Turner v. Turner (1993), 90 Ohio App.3d 161,167 (court rejects contention that calculating the accounts receivable in the property division when it is also the means for appellant to pay the support awards was an abuse of discretion);Capper v. Capper (Dec. 14, 1995), Lawrence App. No. 95-CA-8, unreported (not an abuse of discretion to include work in progress in the valuation of law practice; does not result in income being considered twice, once for division of property and once for spousal support). See, also Reichert v. Reichert (Jan. 17, 1992), Logan App. No. 8-90-21, unreported; Lancione v. Lancione (Sept. 20, 1994), Franklin App. No. 94APF03-308, unreported. This argument was not advanced at the trial court level. Therefore, it is not necessary for this court to consider the merits of appellant's argument. It is well settled that an appellate court will not consider questions not presented, considered or decided by a lower court. In reDismissal of Mitchell (1979), 60 Ohio St.2d 85, 90; Kalish. v.Trans World Airlines (1977), 50 Ohio St.2d 73, syllabus.
In valuing a marital asset, a trial court is neither required to use a particular valuation method nor precluded from using any method. James v. James (1995), 101 Ohio App.3d 668, 681. In reviewing a trial court's valuation of a marital asset, an appellate court may not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered. McCoy v. McCoy (1993), 91 Ohio App.3d 570, 574, citingMyers v. Garson (1993), 66 Ohio St.3d 610. See, also, Willis v.Willis (1984), 19 Ohio App.3d 45, 48.
Accordingly, appellant's assignment of error is found not well-taken.
In her cross-appeal, appellee argues that the trial court erred in only awarding her fifty percent or $14,337.50 of the attorney fees requested. This court finds no merit in this assignment of error.
R.C. 3105.18(H) provides:
 "In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating his rights and adequately protecting his interests if it does not award reasonable attorney's fees."
It has long been the rule that an award of attorney fees is based on, among other things, necessity, and that necessity is determined by a consideration of the parties' financial situation, including income, assets and expenses. _Cassaro v. Cassaro
(1976), 50 Ohio App.2d 368. In Goode v. Goode (1991), 70 Ohio App.3d 125,134, the court noted that a trial court, in reviewing the record to determine the necessity and reasonableness of attorney fees, may use its own knowledge and experience.
An award of attorney fees is a matter within the sound discretion of the trial court, and a decision on this issue may not be reversed absent a clear abuse of discretion. Birath v. Birath
(1988), 53 Ohio App.3d 31.
Upon review of the record, this court does not find that the trial court abused its discretion in its award of attorney fees to appellee.
Accordingly, appellee's cross-assignment of error is found not well-taken.
On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant is ordered to pay the court costs of this appeal.
 __________________________ HANDWORK, J.
 Mark L. Pietrykowski, J. CONCUR.
Richard W. Knepper, P.J., CONCURS AND WRITES SEPARATELY.
[2] Appellant's own expert, Mr. Heaton, testified that "Intrinsic and fair market value are interchangeable terms." In his testimony, Heaton testified that:
 "Intrinsic and fair market value are interchangeable terms. * * * They are one in the same for purposes of this report. * * * There will be a difference [between intrinsic and fair market values] if the practice is going to be sold, this practice as to my understanding is not going to be sold. That is why we valued the practice looking at the current earning flow as on (sic) intrinsic value basis."
Furthermore, appellant argued in his Post Trial Brief that his expert "properly took into consideration the fair market value of Dr. Barone's 50% interest which he refers to from time to time as the intrinsic value of his interest in the corporation."