[Cite as *State v. Bayliff*, 2010-Ohio-3944.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# AUGLAIZE COUNTY

STATE OF OHIO,                                    CASE NO. 2-10-08

   PLAINTIFF-APPELLEE,

  v.

BRANDON B. BAYLIFF,                        **O P I N I O N**

   DEFENDANT-APPELLANT.

**Appeal from Auglaize County Municipal Court**
**Trial Court No. 2009 CRB 00262**

**Judgment Affirmed**

**Date of Decision:  August 23, 2010**

APPEARANCES:

   *Rob C. Wiesenmayer,* **for Appellant**

   *Edwin Pierce,* **for Appellee**

**Rogers, J.**

{¶1} Defendant-Appellant, Brandon Bayliff, appeals from the judgment of the Municipal Court of Auglaize County, denying his motion to suppress evidence, convicting him on one count of possessing a dangerous drug, and sentencing him to six months of non-reporting community control. On appeal, Bayliff argues that the trial court erred in denying his motion to suppress where insufficient evidence was presented that the police officer possessed sufficient probable cause necessary to effectuate a traffic stop. Based on the following, we affirm the judgment of the trial court.

{¶2} In May 2009, Bayliff was charged by complaint with one count of possessing a dangerous drug in violation of R.C. 4729.51(C)(3), a misdemeanor of the first degree. The complaint arose from an incident whereby Bayliff was stopped by a police officer from the Cridersville Police Department for a traffic violation; Bayliff granted the officer permission to search his vehicle; and, the officer found one tablet of Tramadol, for which Bayliff did not have a prescription. Subsequently, Bayliff entered a not guilty plea to the charge.

{¶3} In August 2009, Bayliff filed a motion to suppress the prescription drug found in his vehicle on the basis that the officer did not have sufficient probable cause to stop his vehicle; that the stop of the vehicle was excessively prolonged; and, that the officer did not have a sufficient basis to search his vehicle.

-2-

Additionally, Bayliff argued that his custodial statements were obtained in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution. In regards to his argument pertaining to the illegal stop of his vehicle, Bayliff specifically contended that the officer's claim that he failed to properly stop at a stop sign was unsupported by the videotape of the traffic stop; that the officer's view of the intersection was obstructed; and, that the evidence did not support the officer's second contention for the vehicle stop regarding his improperly illuminated license plate.

{¶4} In October 2009, a hearing was held on the motion to suppress, at which Patrolman Dennis Foxvog testified on direct examination that he is a police officer with the Cridersville Police Department; that, on April 5, 2009, he observed a vehicle traveling from west North Street onto Shawnee Road; that he was at the intersection of Reichelderfer and Main Street; that the vehicle did not stop or slow down at the stop sign at the intersection; that he followed the vehicle and also noticed that the light illuminating the rear license plate was very dim; and, that he initiated a traffic stop on the basis of those two violations.

{¶5} Patrolman Foxvog continued that he was approximately eighty feet, or one block, from the intersection where the vehicle failed to stop at the stop sign; that he was facing the vehicle at the time; that, as he approached the vehicle to initiate a traffic stop, he could only see the letters and numbers on the license plate

when his headlights were shining on the license plate; that the license plate could only be observed approximately ten feet away without the aid of his headlights; that he was ten or fifteen feet from the vehicle when he initiated the traffic stop; that, when he asked for Bayliff's license, registration, and proof of insurance, he appeared very nervous, with his hands shaking and eyes wandering; that he asked Bayliff why he was shaking, and Bayliff replied that he was nervous; that he then asked Bayliff if there was anything in the vehicle that he should be concerned about, and Bayliff responded that there was not; that he asked Bayliff for permission to search the vehicle, to which Bayliff assented; that he then returned to his police cruiser and radioed Officer Joseph to assist him in searching the vehicle; that Officer Joseph arrived approximately a minute-and-a-half later; that, upon their search of the vehicle, they found a pill container with what appeared to be antibiotics and another type of pill; that the pill bottle had a label, but he did not believe the label contained Bayliff's name; that Bayliff admitted that his mother had given him one of the pills in the bottle, which was later found to be a Tramadol tablet, but that he had a prescription for the other pills; that he told Bayliff he would not be charged with anything other than possessing the drugs; that from the time he stopped Bayliff to the time he found the pills in Bayliff's vehicle was approximately fifteen minutes; and, that if he would have issued

Bayliff a citation for the two observed violations, it would have taken him approximately fifteen to twenty minutes.

**{¶6}** On cross-examination, Patrolman Foxvog testified that he wears glasses when reading and using the computer, but that he did not believe he was wearing them on the day of the stop; that, in his previous traffic stops, he had encountered people that were nervous; that he was approximately ten or fifteen feet from Bayliff's vehicle when he was able to read his license plate; that he was still following Bayliff and had not yet stopped him when he was able to read Bayliff's license plate; that, subsequent to conducting the stop of Bayliff's vehicle, he checked Bayliff's driver's license number in the computer, found that Bayliff only had one previous traffic ticket, and decided to issue him a warning; and, that he believed he could see the stop sign at which Bayliff failed to stop, even though it was dark at the time.

**{¶7}** Following Patrolman Foxvog's testimony, the trial court stated the following from the bench:

> **\* \* \* Gentleman, I also, just so, for your information, cause everybody just loves to do just how far you think it is, according to the county's website from Main Street to North Street is over 200 yards, closer to 220. So it's just for your information. That's uh-what the county's website would indicate.**

(Oct. 2009 Motion to Suppress Hearing, Tr., p. 70). Subsequently, the hearing was continued at the request of the State to determine the authenticity of the videotape from the traffic stop.

{¶8} In November 2009, the motion to suppress hearing continued, at which Patrolman Foxvog further testified on re-direct examination that, when he observed Bayliff's vehicle approaching the intersection at North Street and Shawnee Road, there were no obstructions between himself and the vehicle; that he was approximately fifty yards from Bayliff's vehicle as it approached the intersection; that he had been at the intersection since the last hearing, and he still believed the distance to be approximately fifty yards; that, as soon as Bayliff's vehicle turned onto Shawnee road, he noticed that Bayliff's license plate was not fully illuminated; that he then proceeded to follow Bayliff; that, while following Bayliff, he turned off his headlights for "one split second" and was unable to see Bayliff's license plate (Nov. 2009 motion to suppress hearing, tr., p. 6); that the right side of the license plate was very dim, and the left side was totally unreadable; and, that he accidently initially advised Bayliff that he failed to stop at a stop sign on Elizabeth Street, and subsequently advised him that the stop sign was on West North Street.

{¶9} Subsequently, the trial court displayed a map of the area around the traffic stop on a screen in the courtroom, and the following discussion took place:

**Trial Court: Officer, while he's looking, can you see the screen of that TV in front of you there?**

**Patrolman Foxvog: I can.**

**\* \* \***

**Trial Court: Yea, we are not going to play with wrong directions. We're not going to play with wrong distances. He's testifying fifty yards and County says six hundred forty-four feet.**

**State: From?**

**Trial Court: Main Street to North Street.**

**State: The intersection of**

**Trial Court: Main Street and North Street**

**State: From the intersection of Main Street and North Street to?**

**Trial Court: It's on the GS. It will show up on there and you can look at it. You can get up and look at it officer.**

**Patrolman Foxvog: Thank you.**

**Trial Court: Should be a red line on there for the intersection if you would see it. Main Street? And it goes up, the red line goes up the center of Shawnee and or Reichelderfer Road. \* \* \* [A]nd that red line goes up to North Street. And what does the, what does that show as distance from that up on the upper left hand side?**

**Patrolman Foxvog: Six hundred forty-four feet.**

**Trial Court: That's red line is approximately where you were when uh, he, uh, went through the intersection?**

**Patrolman Foxvog: Correct.**

> **Trial Court: And North Street is where he through [*sic*] the intersections? Correct?**
>
> **Patrolman Foxvog: Yes.**
>
> **Trial Court: Well that's a little more than fifty yards. That would be quite a bit more than fifty yards. Fifty yards would be a hundred and fifty feet, so this is more than four times that so, we're more than two hundred yards, right?**
>
> **Patrolman Foxvog: Correct.**
>
> **Trial Court: You think that this is a better estimate of-then what gave [*sic*] in your testimony?**
>
> **Patrolman Foxvog: Yea.**

(Id. at pp. 10-13).

{¶10} On re-cross-examination, Patrolman Foxvog testified that there were approximately four buildings between where he was and where Bayliff approached the intersection, and that, as he pulled behind Bayliff, he could not determine if Bayliff's license plate was illuminated.

{¶11} Sergeant Josh Joseph of the Cridersville Police Department testified that he assisted Patrolman Foxvog with his traffic stop of Bayliff; that, when he arrived at the scene, Patrolman Foxvog informed him that he stopped Bayliff for failing to stop at a stop sign and for having an improperly illuminated license plate, and that Bayliff consented to a search of the vehicle; that he also asked Bayliff if he consented to the search, and Bayliff confirmed that he consented; that

he did not notice whether the license plate was not properly illuminated; that, upon their search of Bayliff's vehicle, they discovered a prescription medication bottle with two different types of pills contained therein; that he asked Bayliff about the pills, and Bayliff stated they were for a tooth that he had pulled, and that one of the pills he received from his mother; and, that he believed the name on the prescription bottle was Bayliff's, but he could not recall.

{¶12} Bayliff testified that, on the night of the traffic stop, he was traveling on North Street and turned onto Shawnee Road; that he came to a complete stop at the stop sign at the intersection of North Street and Shawnee Road; that a car followed him as he turned onto Shawnee Road, but he did not realize it was a police cruiser; that he did not see the vehicle turn its lights off and back on; that, after he was pulled over, he became nervous; that the officer asked him about being nervous and he indicated that he had "anxiety problems" (id. at p. 54); that the officer asked to search his vehicle, and he granted him permission; that he gave no "qualification or reservation" when he gave permission to search his vehicle (id. at p. 60); that the medication bottle found in his vehicle had his name on the outside; that the medication was an antibiotic for his wisdom teeth; that there was one pill in the bottle that was different from the rest, but he was not sure what type of pill it was; that he did not know who the pill belonged to; that he told the officers that the other pill in the bottle might have come from his mother's

medicine drawer "because there's all kinds of stuff. [His] uncle died of cancer and he had a lot of medications and stuff" (id. at p. 61); and, that he did not take the pill.

{¶13} In December 2009, the trial court denied the motion to suppress, stating the following in its journal entry:

> **One additional issue came from the hearing. The officer testified that it was 50 yards from the intersection of Shawnee and Main to the intersection of North and Shawnee. The Court checked the county website and reviewed with the officer that the GIS map showed at least 215 yards between the intersections.**
>
> **\* \* \***
>
> **The Court finds that while the evidence of whether or not the officer had reasonable cause to stop the defendant due to running or rolling a stop sign, the officer did have reasonable cause to make the stop due to the dimly illuminated license plate light. The officer did ascertain by turning off his headlights that the license plate was not properly illuminated and did subsequently check the light in the presence of the defendant. There was no evidence presented that the license plate was properly illuminated. Thus, even if the court would determine that the evidence of the failure to stop was insufficient, the stop was proper based upon the license plate charge.**

(Dec. 2009 Journal Entry, pp. 2-3).

{¶14} In January 2010, Bayliff withdrew his not guilty plea and entered a plea of no contest to possessing a dangerous drug in violation of R.C. 4729.51(C)(3). The trial court accepted the plea, entered a conviction, and

sentenced him to non-reporting community control sanctions, in addition to imposing a $100 fine and a six-month operator's license suspension.

{¶15} It is from the trial court's denial of his motion to suppress that Bayliff appeals, presenting the following assignment of error for our review.

**THE CRIDERSVILLE POLICE OFFICER DID NOT HAVE SUFFICIENT EVIDENCE TO MAKE A TRAFFIC STOP OF APPELLANT.**

{¶16} In his sole assignment of error, Bayliff argues that the trial court erred in denying his motion to suppress. Specifically, he contends that insufficient evidence was presented at the suppression hearing to establish probable cause for the traffic stop, as the officer's testimony did not provide a sufficient basis for a conclusion that he failed to stop at the stop sign or that his license plate was improperly illuminated. We disagree.

{¶17} "Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact." *State v. Dudli*, 3d Dist. No. 3-05-13, 2006-Ohio-601, ¶12, citing *United States v. Martinez* (C.A.11, 1992), 949 F.2d 1117. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson* (2000), 137 Ohio App.3d 847, 850. Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of facts so long as they are supported by competent, credible

evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶100, citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20. The appellate court must then review the application of the law to the facts de novo. *Roberts*, supra, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8.

**{¶18}** The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures, and require the suppression of any evidence seized as a result of an unreasonable search and seizure. *Mapp v. Ohio* (1961), 367 U.S. 643, 649; *State v. Jones,* 88 Ohio St.3d 430, 434, 2000-Ohio-374, overruled on other grounds by *State v. Brown,* 99 Ohio St.3d 323, 2003-Ohio-3931.

**{¶19}** The constitutionality of a traffic stop rests upon a determination of whether the police officer had a sufficient reasonable articulable suspicion of criminal activity, which is determined by evaluating the objective facts surrounding the stop. *State v. Vlachos,* 3d Dist. No. 17-08-24, 2009-Ohio-915, ¶¶10-11, citing *State v. Bobo* (1988), 37 Ohio St.3d 177, 179; *Dayton v. Erickson,* 76 Ohio St.3d 3, 11-12, 1996-Ohio-431. A reasonable articulable suspicion is "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *State v. Stephenson*, 3d Dist. No. 14-04-08, 2004-Ohio-5102, ¶16, quoting *Bobo*, 37 Ohio St.3d at 178. A police officer's testimony alone is sufficient to establish reasonable articulable suspicion

for a stop. See *State v. Claiborne,* 2d Dist. No. 19060, 2002-Ohio-2696. Additionally, "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution * * *." *Erickson,* 76 Ohio St.3d at 11. Probable cause is "'a reasonable ground for belief of guilt,'" *State v. Moore,* 90 Ohio St.3d 47, 49, 2000-Ohio-10, quoting *Carroll v. United States* (1925), 267 U.S. 132, 161, and is determined by "examining the historical facts, i.e., the events leading up to a stop or search, 'viewed from the standpoint of an objectively reasonable police officer.'" *Bowling Green v. Godwin,* 110 Ohio St.3d 58, 2006-Ohio-3563, ¶14, quoting *Ornelas v. United States* (1996), 517 U.S. 690, 696. Moreover, a finding of probable cause is fact-specific and turns upon what the officer knew at the time he conducted the traffic stop. *Erickson,* 76 Ohio St.3d at 10.

{¶20} Once a traffic stop has been made, its duration "must be tailored to its justification and the seizure of the driver must last no longer than reasonably necessary to effect its purpose." *State v. Kazai*, 6th Dist. No. WD-03-035, 2004-Ohio-4147, ¶9, citing *State v. Gonyou* (1995), 108 Ohio App.3d 369, 372. However, the duration of a traffic stop may be extended where additional information is gathered during the stop which provides an independent, reasonable articulable suspicion that additional offenses have been or are being committed.

*State v. Hundley*, 3d Dist. Nos. 15-09-10, 15-09-12, 2009-Ohio-6873, ¶15, citing

*Stephenson*, 2004-Ohio-5102, at ¶17.

**{¶21}** R.C. 4511.43(A) provides the requirements for all drivers

approaching a stop sign, and states, in pertinent part:

> **Except when directed to proceed by a law enforcement officer, every driver of a vehicle or trackless trolley approaching a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering it. After having stopped, the driver shall yield the right-of-way to any vehicle in the intersection or approaching on another roadway so closely as to constitute an immediate hazard during the time the driver is moving across or within the intersection or junction of roadways.**

**{¶22}** Additionally, R.C. 4513.05(A) provides the requirements for the

illumination of rear license plates, and states as follows:

> **Either a tail light or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate, when such registration plate is required, and render it legible from a distance of fifty feet to the rear. * * ***

**{¶23}** In the case at bar, Patrolman Foxvog testified at the October 2009

hearing that he observed Bayliff fail to stop at the stop sign at the intersection of

North Street and Shawnee Road; that he was approximately eighty feet from the

intersection when he observed the vehicle fail to stop; that he believed he could

see the stop sign even though it was dark at the time; that he followed the vehicle

and also noticed that the license plate was not fully illuminated; that he could only

see the letters and numbers on the plate if his headlights were shining on it; and, that he could only see the license plate without the aid of his headlights from ten feet away.

{¶24} During the November 2009 hearing, Patrolman Foxvog further testified that there were no obstructions between his position and the intersection at which Bayliff failed to stop; that he was approximately fifty yards from Bayliff's vehicle as it approached the intersection; that, as soon as Bayliff proceeded through the intersection, he noticed that the vehicle's license plate was not fully illuminated; and, that, while following the vehicle, he turned his headlights off and back on, and was unable to see the license plate while his headlights were off.

{¶25} Based on the evidence presented at the hearing, we find there was sufficient probable cause for Patrolman Foxvog's stop of Bayliff's vehicle[1]. Testimony was presented that Bayliff's license plate was not properly illuminated so as to render it visible to a distance of fifty feet; that the license plate could only be seen without the aid of additional light from a distance of ten or fifteen feet; and, that this license plate violation was observed prior to the vehicle stop.

{¶26} Furthermore, although the trial court's journal entry is not specifically clear as to whether probable cause for the traffic stop existed solely on

---

[1] While we have found probable cause existed for the traffic stop, we reiterate that a reasonable articulable suspicion of criminal activity is all that is required to commence an investigatory stop. See *Hundley*, 2009-Ohio-6873, at FN3.

the basis of Bayliff's failure to stop at a stop sign, we find that the testimony presented established probable cause exclusively on this ground. While the credibility of Patrolman Foxvog's testimony on this issue was called into question based upon the concern raised by the trial court of the actual distance between Patrolman Foxvog and the intersection at which Bayliff failed to stop, the standard for determining whether the stop was proper is whether there was a "a reasonable ground for belief of guilt," not that the offense was committed beyond a reasonable doubt. *Moore,* 90 Ohio St.3d at 49. Accordingly, we find that Bayliff's failure to stop at the stop sign also constituted probable cause for the traffic stop.

{¶27} Finally, we note that, at both the October and November hearings, the trial court went outside the evidence and conducted its own investigation as to the distance between the intersection at which Bayliff failed to stop, and the intersection at which Patrolman Foxvog was located at the time he observed Bayliff's failure to stop. According to the trial court's internet research, the distance was approximately two hundred yards, despite Patrolman Foxvog's testimony at the October hearing that he was eighty feet from the intersection, and his testimony at the November hearing that he was fifty yards from the intersection. While the trial court may have discovered the correct distance between Patrolman Foxvog and Bayliff, it was impermissible for the trial court to

consider evidence outside the record and conduct its own investigation of the facts. See, generally, *State v. Mattox* (1966), 8 Ohio App.2d 65; *State v. Denoon* (1966), 8 Ohio App.2d 70. There is no authority for a trial court's independent investigation. Nevertheless, the trial court's actions did not affect the disposition of this case.

{¶28} Accordingly, we overrule Bayliff's assignment of error.

{¶29} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and PRESTON, concur.**

**/jnc**