[Cite as *A.E. v. J.E.*, 2024-Ohio-1785.]

# Court of Appeals of Ohio, Eighth District

County of Cuyahoga
Nailah K. Byrd, Clerk of Courts

A.E.

|  |  |  |
|---|---|---|
| Appellee | COA No.<br>112847 | LOWER COURT NO.<br>DR-19-377679 |
| -vs- | DOMESTIC RELATIONS | |
| J.E. | | |
| Appellant | Motion No. 574091 | |

Date    05/03/2024

_____
Journal Entry
_____

Sua sponte, this court reconsiders its decision in this case.  The original decision in this appeal, *A.E. v. J.E.*, 8th Dist. Cuyahoga No. 112847, 2024-Ohio-1585, released by this court on April 25, 2024, is hereby vacated and substituted with the journal entry and opinion released this same date.

Presiding Judge Eileen A. Gallagher, Concurs

Judge Emanuella D. Groves, Concurs

_____
Eileen T. Gallagher, Judge

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

A.E., :

    Plaintiff-Appellee, :

                                No. 112847

    v. :

J.E., :

    Defendant-Appellant. :

_____

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** May 3, 2024

_____

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-19-377697

_____

### *Appearances:*

Stafford Law Co., L.P.A., Joseph G. Stafford, Nicole Cruz,
and Kelley R. Tauring, *for appellee*.

Thurman and Associates, L.L.C., Adam J. Thurman, and
Erik B. Quattro, *for appellant*.

ON SUA SPONTE RECONSIDERATION[1]

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, J.E. ("Husband"), appeals a judgment entry of divorce and claims the following errors:

1. The trial court erred and abused its discretion when it determined that appellant committed financial misconduct and found that appellant wrongfully dissipated $419,028.50 "that this court is aware of."

2. The trial court erred and abused its discretion by ordering appellant to pay $10,600.00 per month as spousal support and $3,824.00 as child support plus fifty percent (50%) of all bonuses; deferred compensation; incentive payments; and all employment enhancements.

3. The trial court erred and abused its discretion when it substituted its own value for the marital residence, which was not based upon facts or evidence presented at trial.

4. The trial court erred and abused its discretion in dividing appellant's income twice by ordering appellant to pay temporary support and then dividing the funds appellant had remaining in counsel for appellee's IOLTA account after the payment of his support.

5. The trial court erred and abused its discretion in ordering appellant to pay $110,000.00 in attorney fees to appellees' counsel.

6. The trial court erred and abused its discretion when it determined that appellee's non-descript loan from her parents was marital property where the funds were used for the higher education of the parties' emancipated children.

7. The trial court erred and abused its discretion in granting appellee's ownership of an insurance policy that was no longer in existence.

---

[1] Sua sponte, the original decision in this appeal, *A.E. v. J.E.*, 8th Dist. Cuyahoga No. 112847, 2024-Ohio-1585, released on April 25, 2024, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

8. The trial court erred and abused its discretion by not adopting appellant's proposed shared parenting plan and reducing appellant's parenting time.

9. The trial court failed to account for the funds missing from Stafford Law's IOLTA account.

10. The trial court erred and abused its discretion by leaving restraining orders in effect and not dismissing third-party defendant.

{¶ 2} We reverse the trial court's judgment and remand the case to the trial court for further proceedings.

## I. Facts and Procedural History

{¶ 3} A.E. ("Wife") and Husband were married on April 26, 1997, and they had four children born as issue of the marriage. The parties separated on July 8, 2019, and Wife filed a complaint for divorce three weeks later on July 24, 2019. Wife also filed a motion for temporary support with affidavit, and Husband filed a counter affidavit to the motion for temporary support outlining all his sources of income. According to Husband's counter affidavit, Husband's income is composed of a base salary plus sales incentive payments, direct cash deferral payments, contributions to his nonqualified deferred compensation plan, restricted stock units ("RSUs"), and other miscellaneous additional compensation (collectively referred to as "bonus income").

{¶ 4} Husband's counter affidavit to Wife's motion for temporary support shows that Husband received a base salary of $251,326.40 in 2019. The affidavit also shows that he received nearly identical base salaries from 2015 through 2018. The bulk of Husband's compensation was comprised of bonus income. Husband's

counter affidavit states that cash incentive payments are paid in February of each year, if they are awarded. Deferred compensation payments are also disbursed in February, but only one third of the payment is actually made in February and the remainder is paid in one-third installments each February for the next three years. RSUs, if awarded, are granted in February or March of each year and vest three years later.

{¶ 5} Based on the parties' affidavits, the trial court issued a temporary support order on November 18, 2019, finding that Wife had a gross income of $0.00, and Husband had a gross income of $876,423.56 through his employment as an investment banker at Fifth Third Bancorp. Pursuant to the November 18, 2019 temporary support order, Husband was required to pay $8,000 per month in temporary spousal support; $3,115.13 per month in temporary child support; the mortgage payment on the marital residence in the amount of $842.13 per month; all the expenses associated with the parties' New York vacation home totaling $2,300 per month; and $500 per month toward an "existing undetermined arrearage" of support. Altogether, Husband was ordered to pay a total of $14,757.26 per month in child and spousal support.

{¶ 6} Two months after issuing the temporary support order, on January 22, 2020, the trial court restrained Husband's employer, Fifth Third Bancorp, from releasing or disbursing "any bonuses, distributions, payroll incentives, monetary awards, or any funds over and above his base pay." (Jan. 22, 2020, judgment entry.)

As a result, Husband was ordered to pay Wife a total of $177,000.00[2] per year in support from his pre-tax, base salary of $251,326.40. After subtracting Husband's support obligation of $177,000 from his base salary of $251,326.40, Husband was left with $74,326.40 with which to pay his own living expenses and the entirety of the parties' joint income tax liability.

{¶ 7} In 2022, Husband owed $51,282.00 in federal tax liability for the 2021 tax year. (Defendant's exhibit G; tr. 82.)[3] In 2023, Husband's 2022 tax return indicated that he owed $77,467.00 in federal income tax liability due to his inability to make all of the quarterly, estimated tax payments. (Def. exhibit H; tr. 41, 47, 81, 82.) Payments of estimated taxes are necessary because Husband's employer cannot withhold more than 22% in taxes on his "supplemental income" as defined by 26 C.F.R. 31.3402(g)-1. All Husband's bonus income is included in the definition of "supplemental income" under 26 C.F.R. 31.3402(g), and the failure to make quarterly estimated tax payments results in penalties and interest on the taxpayer's tax liability. *See* 26 U.S.C. 6654.

{¶ 8} The trial court issued similar restraining orders against Fifth Third Bancorp to prevent the release and distribution of Husband's "non-discretionary bonuses * * * including but not limited to deferred compensation and/or restricted stock units" in 2021, 2022, and 2023. Husband filed several motions to dissolve the restraining orders and to release the funds in order to pay his support obligations

---

[2] $14,750 x 12 months = $177,000.
[3] All citations to the transcript refer to the May 15, 2023 trial transcript.

and to make quarterly estimated income tax payments. Husband's motion, filed February 2, 2023, states:

> [T]his court restrained all Defendant's bonuses in 2020 and 2021, leaving him to receive only his set salary, yet expects Defendant to pay temporary spousal support, child support, and all expenses the family established based on his salary and his bonuses. Then, when Defendant was unable to meet all his obligations because the Court restrained over half of his income, this Court ordered that his bonuses be held by Plaintiff's counsel, so that Plaintiff's counsel could then disperse the monies to ODJFS-OCSS ["CSEA"]. This court ordered that Defendant be responsible for spousal support, child support, expenses, etc., then restricted his ability to follow this Court's orders.

{¶ 9} The court originally ordered that Husband's bonus income be held in his lawyer's IOLTA account, and his monthly spousal and child support obligations were to be paid to the child support enforcement agency ("CSEA") from that account. Husband's lawyer later withdrew from representation, and Wife filed a motion to transfer the funds to her own lawyer's IOLTA account. The trial court denied Wife's motion but ordered Husband to open an escrow account at Fifth Third Bank to be managed by an escrow agent. Husband's former attorney transferred the funds from her IOLTA account to the new escrow account at Fifth Third Bank.

{¶ 10} In February 2022, the trial court ordered Fifth Third Bank to transfer Husband's bonus income to Wife's counsel, to be held in his IOLTA account. The court further ordered Wife's counsel to release the sum of $11,225.13 from the IOLTA account each month and apply it to Husband's monthly temporary support obligation.

{¶ 11} The case proceeded to trial before a magistrate in February and October 2021, and the magistrate issued a decision in April 2022. Both parties filed objections to the magistrate's decision. The trial court sustained Husband's second objection and found that the magistrate had imposed unreasonable time restrictions on the presentation of evidence that unfairly prejudiced Husband. As a result, the trial court ordered a new trial, which took place on May 15, 2023.

{¶ 12} Meanwhile, in December 2022, Wife discovered that CSEA had refunded money to Husband that had been paid as child support from his restrained bonus income. Wife filed a motion for direct payment and disgorgement of funds, claiming CSEA improperly refunded support payments to Husband and asked that Husband be ordered to immediately return the refunded payments in the amount of $30,388.23 to her lawyer's IOLTA account. Husband opposed the motion, arguing that the refunds were made because (1) one of the parties' children emancipated several months earlier but CSEA continued to collect $1,500 per month after the child's emancipation, (2) CSEA collected double payments several times, and (3) the $30,388.23 represented an overpayment of child support. The trial court granted Wife's motion and ordered Husband to remit payment of the $30,388.23 to Wife's counsel within seven days of the journalization of the court's judgment entry. (Dec. 15, 2022, judgment entry.) Husband complied. (*See* plaintiff's exhibit No. 59, p. 129.)

{¶ 13} At the second trial on May 15, 2023, Husband testified about his base salary and bonus income. He also presented evidence demonstrating that, other

than his salary, none of the payments are fixed or guaranteed. He presented evidence showing that his income fluctuates from year to year.

{¶ 14} The parties also presented evidence relative to marital property and to the allocation of parental rights with respect to the parties only remaining minor child. At the conclusion of the evidence, the trial court ruled that Wife shall retain the marital home located on Avalon Drive in Rocky River, Ohio, free and clear from any claim by Husband. The court also ordered that Wife would retain all items of personal property in the home

{¶ 15} The court determined that the marital home was valued at $1,150,000.00. The property was encumbered by mortgage balance of $178,860.37 as of March 11, 2023, and there were outstanding property taxes due and owing in the amount of $4,467.24. The court concluded there was $966,672.39 in equity in the property and divided the equity equally between the parties. Wife was charged with paying off the mortgage and the outstanding real estate taxes.

{¶ 16} The parties owned a second home on Shadyside Road, in Clymer, New York. The parties entered into an agreed judgment entry wherein they to sell the New York property, and the trial court ordered the parties to split the proceeds from the sale equally.

{¶ 17} The trial court divided the parties' personal property, bank accounts, retirement assets, investment accounts, and automobiles. The trial court also determined that Wife shall be the owner and sole beneficiary of Husband's Northwestern Mutual life insurance policy with a total death benefit of $500,000.

The court ordered Husband to pay the premiums on the life insurance policy until he no longer has a support or property division obligation.

{¶ 18} The trial court designated Wife the residential parent and legal custodian of the parties' only child who remained a minor at the time of the divorce. The court ordered Husband to pay child support in the amount of $3,796.83 per month, plus cash medical support in the amount of $27.17 per month for a total child-support obligation of $3,824.00 per month.

{¶ 19} The trial court ordered Husband to pay Wife spousal support in the amount of $10,600.00 per month, effective June 1, 2023, indefinitely. In addition, Husband was ordered to pay Wife 50% of all bonus income in addition to the monthly spousal support, indefinitely.

{¶ 20} The trial court found that Husband held Wife "economically hostage" by failing to pay his temporary support obligations under the November 18, 2019 temporary support order, and that he engaged in financial misconduct. In its judgment entry of divorce, the court stated:

> The Court finds that Defendant engaged in gross financial misconduct including the dissipation, destruction, concealment and fraudulent disposition of assets. First, Defendant failed to disclose the proper values of his assets in his Financial Disclosure Statements. In addition, Defendant failed to disclose that he liquidated restricted stock units in the sum of $326,238.90. Defendant also transferred title of his vehicle into the name of the parties' son and used $27,000.00 of marital funds to pay the debt associated with the vehicle prior to transfer. Further, Defendant dissipated nearly $66,000.00 from his Chase checking account prior to the commencement of the re-trial. In all, Defendant wrongfully dissipated approximately $419,028.50 of marital funds without the knowledge or permission of Plaintiff or this Court.

This case has been pending since July 2019. At the May 15, 2023 re-trial, nearly four (4) years after the commencement of this action, Defendant finally admitted after rigorous cross-examination that he had been liquidating restricted stock units provided to him by his employer every single year this case has been pending. Pursuant to his testimony, the restricted stock units awarded to him by his employer vested over a term of three (3) years. As such, all of the restricted stock units liquidated by Defendant during the term of these proceedings were marital property subject to division by this Court. Defendant further admitted that he did not divide any of the proceeds from the liquidation of the restricted stock units with Plaintiff. In fact, until the re-trial, Plaintiff, and the Court, was [sic] completely unaware that Defendant had been unilaterally liquidating the restricted stocks since 2019. Defendant did not provide any accounting or justification for the use of the proceeds from the sale of the restricted stocks. It is clear from Defendant's testimony that he never intended to disclose to Plaintiff that he liquidated the restricted stock because it was "my money," a theme that echoed throughout the entirety of the divorce proceedings.

Defendant also did not provide any rationale or justification for transferring title of his vehicle to his son, or the nearly $70,000.00 reduction in his Chase checking account just before the May 15, 2023 re-trial.

In total, Defendant wrongfully dissipated approximately $419,028.50 of marital funds, that the Court is aware of, during the pendency of the divorce. Plaintiff's one-half interest in these marital funds equals $209,514.25. Defendant's failure to disclose assets and his purposeful and repeated dissipation of those assets, not only violated this Court's orders but caused economic harm to Plaintiff and their children.

(Judgment entry of divorce p. 9.)

{¶ 21} The court found that the economic misconduct justified a distributive award to Wife in the amount of $500,000 and ordered Wife to receive Husband's equity interest of $483,336.19 in the marital residence as partial satisfaction of the distributive award. To complete the award, the court also ordered Husband to pay Wife the sum of $16,663.81 within seven days of the journalization of the judgment entry of divorce.

{¶ 22} Finally, the court ordered Husband to pay Wife's attorney fees in the amount of $110,000.00, and that all restraining orders previously issued by the court "shall not be released until all property has been divided" in accordance with the judgment entry of divorce.

{¶ 23} Husband now appeals the trial court's judgment.

## II. Law and Analysis

### A. Standard of Review

{¶ 24} Domestic relations courts must have discretion to do what is equitable upon the facts and circumstances of each divorce case. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989). We, therefore, review a trial court's determination in domestic relations cases for an abuse of discretion. *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 130, 541 N.E.2d 597 (1989).

{¶ 25} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. A court abuses its discretion "when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19. The term abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 26} There is no abuse of discretion where the record contains competent, credible evidence to support the trial court's decision. *Trolli v. Trolli*, 8th Dist. Cuyahoga No. 101980, 2015-Ohio-4487, ¶ 29, citing *Kapadia v. Kapadia*, 8th Dist. Cuyahoga No. 94456, 2011-Ohio-2255, ¶ 24. When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

## B. Financial Misconduct

{¶ 27} In the first assignment of error, Husband argues the trial court erred and abused its discretion in determining that he committed financial misconduct. Husband argues the trial court erroneously determined that he dissipated $419,028.50 by (1) failing to disclose the liquidation of RSUs, (2) improperly using marital funds to pay off an automobile that he transferred to his son, and (3) squandering funds from his Chase checking account. As previously stated, the court awarded Wife a distributive award in the amount of $500,000 for this alleged misconduct.

{¶ 28} R.C. 3105.171(E)(4) provides that if a spouse has engaged in financial misconduct, including but not limited to the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property. The complaining spouse bears the burden of proving the financial misconduct. *Victor v. Kaplan*, 2020-Ohio-3116, 155 N.E.3d 110, ¶ 138 (8th Dist.).

{¶ 29} "A spouse commits 'financial misconduct' where he or she engages in intentional conduct by which he or she either profits from the misconduct or intentionally defeats the other spouse's interest in marital assets." *Id.*, citing *Rodgers v. Rodgers*, 8th Dist. Cuyahoga No. 105095, 2017-Ohio-7886, ¶ 30; *Best v. Best*, 10th Dist. Franklin No. 11AP-239, 2011-Ohio-6668, ¶ 17 (stating that financial misconduct occurs when one spouse intentionally interferes with the other spouse's property rights).

## 1. Liquidation of RSUs

{¶ 30} The trial court ruled that Husband failed to disclose the liquidation of his RSUs. However, Husband identified the RSUs in his counter affidavit to Wife's motion for temporary support in August 2019, and they were listed on plaintiff's exhibit No. 48, which counsel received shortly before the first trial in 2021. The last page of exhibit No. 48 shows the quantity of RSUs vesting each year as well as the February dates on which they vested or were due to vest. The RSUs were also listed in plaintiff's exhibit No. 66(A), which consists of Fidelity Investments account records listing all of Husband's RSU grants and values.

{¶ 31} Plaintiff's exhibit No. 48 includes a letter from Fifth Third Bancorp's lawyer in response to subpoenas from Wife's lawyer. The email shows that Wife requested records regarding Husband's bonus income in July 2020, but Fifth Third Bancorp did not provide all the desired documents because, in Fifth Third Bancorp's opinion, the subpoenas were "wrongly issued." The letter also indicates that Wife's counsel did not complain about the missing documents at that time. Therefore,

despite Wife's statements to the contrary, evidence of the RSUs was available prior to the first trial in February 2021.

{¶ 32} Undisputed testimony showed that the Fidelity Investments account is an employer-managed account that holds the RSUs. (Tr. 139-141.) The account is not in Husband's name, he has no control over it, and he has no access to the RSUs until they vest. (Tr. 139-141.) When the RSUs vest, Husband is partially taxed on the value of each share at the time of vesting as ordinary income (i.e., not capital gains). These amounts are reflected on Husband's paystubs and W-2, which were admitted into evidence as defendant's exhibits I, J, and L.

{¶ 33} The vested RSUs appear in the employer-managed account at Fidelity Investments, minus the mandatory IRS tax withholding. (Plaintiff's exhibit No. 66(A).) Husband can liquidate the vested RSUs at the then-existing stock price, which may be higher or lower than the amount on which Husband was taxed at the time of vesting.

{¶ 34} Husband testified that he liquidated the vested RSUs received in 2021 and 2022 to pay the parties' 2020 and 2021 tax liabilities. (Tr. 146-148; defendant's exhibit G.) The evidence further showed that the vested RSUs in the amount of $69,476.50 received in 2023 were still in his employer-managed account at the time of trial. (Tr. 117, 146.) And the RSU amount of $52,684 received in 2019 was liquidated and disposed of before Wife filed the complaint for divorce. (Tr. 81.) Therefore, the vested RSUs were not dissipated for Husband's sole benefit or to intentionally defeat Wife's interest in these marital assets. Some were distributed

before the complaint for divorce was filed, others were used to pay the parties' income tax liabilities, and some remained in Husband's employer-managed account.

{¶ 35} The November 18, 2019 temporary support order found that Husband's income for support purposes was $876,423.56, and ordered Husband to pay Wife spousal and child support in the amount of $11,775.13 per month. Because the RSUs were included as part of Husband's income in the November 18, 2019 temporary support order, Husband was free to use the RSUs to pay tax liabilities and living expenses just as he could any other income remaining after paying his support obligations. Nothing in the temporary support order prohibited Husband from using the RSUs, and the trial court accounted for the RSUs as part of Husband's income when it calculated the amount of spousal and child support Husband had to pay during the pendency of the litigation.

{¶ 36} Furthermore, the trial court restrained all of Husband's income except for his base salary of $251,326.40 per year. Yet, the court required him to pay Wife a total of $177,000 per year in spousal and child support. After subtracting Husband's support obligation of $177,000 from his pre-tax, base salary of $251,326.40, Husband was left with $74,326.40 with which to pay his own living expenses and the entirety of the parties' joint income-tax liability. In 2021, Husband owed $51,282 in taxes. (Defendant's exhibit G.) Husband also owed four additional estimated-tax payments of $19,267, which totaled $80,000 per year. (Defendant's exhibit G.) As a result, the court's restraining orders left Husband with next to

nothing to live on. It was not unreasonable under these circumstances for Husband to conclude that he could use the RSUs to pay the parties' tax liabilities since the RSUs were counted as income in the temporary support order. Therefore, the trial court abused its discretion when it determined that Husband wrongfully dissipated the RSUs.

### 2. $66,000 from Chase Bank

{¶ 37} Husband opened a checking account at Chase Bank on August 6, 2019, where he deposited his net salary and any monies that were not otherwise restrained by the trial court's restraining orders. The court found that Husband dissipated $66,000 from his Chase Bank account. Indeed, the January 2023 statement from the Chase account reflects a balance of $94,827.40 (Plaintiff's exhibit No. 59(A), p. 129.), and Husband's May 5, 2023 financial disclosure affidavit reflects a balance of $29,037.81. The difference between the January balance of $94,827.40 and the May 2023 balance of $29.037.81 is slightly less than $66,000.

{¶ 38} However, the February 2023 statement for the account shows that $30,388.23 was wired to Wife's lawyer's IOLTA account. (Defendant's exhibit P, p. 1,325.) As previously stated, CSEA refunded the overpayment of child support to Husband in the amount of $30,388.23. Wife filed a motion for disgorgement of the funds, and the trial court granted Wife's motion and ordered Husband to remit payment in the amount of $30,388.23 to Wife's counsel. The February 2023 statement from the Chase account shows that Husband complied with the court's order and wired the money to Wife's counsel. (Plaintiff's exhibit No. 59(A), p. 129.)

Therefore, the $30,388.23 that was wired to Wife's counsel pursuant to the court's order was not a dissipation of marital funds.

{¶ 39} Husband also used the Chase account to pay rent of $4,200 per month, the mortgage payment on the martial home in the amount of $842.13 per month, and the expenses associated with the parties' New York home in the amount of $2,300 per month. These expenses totaled $7,342.13 per month. Husband listed his living expenses on the financial disclosure statement that he filed on May 5, 2023. He also described these expenses during his testimony at trial. (Tr. 95-99.) Thus, the evidence showed that the $66,000 Husband spent between January and May 2023, was used to comply with the court's order to remit $30,388.23, to maintain the parties' marital and vacation homes, and to pay for Husband's ordinary living expenses. There is no evidence that Husband profited from these payments or that he willfully defeated Wife's interest in marital assets.

### 3. Car Loan

{¶ 40} However, Husband admitted that he used $27,000 from the Chase account to pay off his son's car loan. Despite the trial court's finding to the contrary, Husband testified that he never transferred title of the car to his son but that the car was always in his son's name. (Tr. 106.) Nevertheless, the issue here is whether Husband committed financial misconduct using $27,000 from the Chase checking account to pay off his son's car loan. To answer this question, we must determine whether the funds in the Chase checking account are marital property subject to

division or after-support-paid funds that Husband was entitled to keep or spend however he desired.

{¶ 41} As previously stated, Husband deposited his take-home pay into the Chase account he opened after commencement of the divorce proceedings. As more fully explained in the fourth assignment of error, because the trial court ordered Husband to pay Wife more than half of his income, the court's temporary spousal support award was not equitable and requires a recalculation. Only when temporary spousal support is recalculated in an equitable fashion can it be determined whether the money in the Chase checking account is marital property or Husband's separate, after-support-paid income. Nevertheless, regardless of the outcome of that calculation, it is clear that Husband believed the funds in the Chase account were after-support-paid funds that he was entitled to keep or spend however he wished. There is, therefore, no evidence that he intended to profit or intentionally defeat Wife's interest in marital assets by paying off his son's car loan.

### 4. Economically Hostage

{¶ 42} Finally, the trial court determined that Husband held Wife "economically hostage" by failing to meet his temporary support obligations. (Judgment entry of divorce p. 14.) The court's order states:

> From the beginning of this case[,] Defendant purposefully and willfully held Plaintiff economically hostage by failing to pay his temporary support obligations pursuant to the November 18, 2019 Temporary Support Order. On May 6, 2021, approximately 18 months after the Court issued the Temporary Support Order, this Court issued a Judgment Entry finding that Defendant had a support arrearage of $67,169.27. The Court ordered the $67,169.27 arrearage be paid from

Defendant's restrained employment bonuses held in an IOLTA account and that all further support payments be made from the IOLTA account during the pendency of the case.

{¶ 43} The November 18, 2019 temporary support order required Husband to pay a total of $14,757.26 per month in child and spousal support. Two months after the temporary support order, on January 22, 2020, the trial court restrained Husband's employer from releasing or disbursing "any bonuses, distributions, payroll incentives, monetary awards, or any funds over and above his base pay." (Jan. 22, 2020, judgment entry.) Again, Husband's pre-tax, base salary was $251,326.40, and he was required to pay a total of $177,000 per year in support. After subtracting Husband's support obligation from his base salary, he was left with $74,326.40 with which to pay his own living expenses and the parties' income tax liabilities. Defendant's exhibit G shows that Husband pays nearly $80,000 per year in estimated income tax. Quarterly, estimated payments are necessary to avoid interest and penalties because his employer was only permitted to withhold 22% in taxes on his "supplemental income," and all of his bonus income is "supplemental income." 26 C.F.R. 31.3402(g)-1; 26 U.S.C. 6654.

{¶ 44} Husband testified that he needed some of his bonus income to pay support, taxes, the mortgage on the parties' marital residence and the expenses associated with the New York residence. (Tr. 98.) Husband also filed several motions over the course of four years of litigation asking the court to release some of his restrained income so that he could meet his financial obligations. In a motion

titled "Defendant's emergency motion for relief from ex parte orders" filed March 4, 2021, Husband advised the court:

> On November 18, 2019, the Court issued a Temporary Support Order that established [Husband]'s support obligation based upon an income of $876,423.56, **even though all but $250,000 of [Husband]'s 2019 wages were restrained and therefore unavailable to satisfy any support obligation**.

(Emphasis sic.) Three months later, in June 2021, Husband filed a motion titled "Emergency motion to partially dissolve restraining orders to pay income tax liability." On October 1, 2021, Husband filed another motion seeking the release of some of his restrained income to ensure payment of the "[t]he remaining balance of $33,675.39" of temporary support. Finally, on February 1, 2023, Husband filed a motion titled "Defendant's motion to dissolve temporary restraining orders" once again asking the court to release restrained income. This motion states, in relevant part:

> [T]his Court found Defendant's income for temporary support purposes to be almost $900,000, when Defendant's [base] salary is significantly less — approximately $250,000. It was Defendant's bonuses in 2019 that allowed Defendant to earn nearly $900,000. However, since that time, this Court restrained all of Defendant's bonuses in 2020 and 2021, leaving him to receive only his [base] salary, yet expects Defendant to pay temporary spousal support, child support, and all the expenses of the family based on his salary and his bonuses. Then, when Defendant was unable to meet all his obligations because the Court restrained over half of his income, this Court ordered that his bonuses be held by Plaintiff's counsel, so that Plaintiff's counsel could then disperse the monies to ODJFS-OCSS ["CSEA"]. *This Court ordered that Defendant be responsible for spousal support, child support, expenses etc., then restricted his ability to follow this Court's orders.*

(Emphasis added.) The trial court never ruled on any of these motions.

{¶ 45} Husband was not at fault for failing to pay the entirety of his support obligations. He filed motion after motion seeking the release of funds in order to pay his support obligations and income tax liabilities, and the trial court ignored his requests. Husband did not keep Wife "economically hostage." The court's restraining orders, coupled with its failure to rule on any motions for relief from those orders, kept Husband, and therefore Wife, economically hostage.

{¶ 46} We find no evidence that Husband committed financial misconduct. Therefore, the distributive award to Wife in the amount of $500,000 for financial misconduct was an abuse of discretion. The first assignment of error is sustained.

## C. Spousal and Child Support

{¶ 47} In the second assignment of error, Husband argues the trial court erred and abused its discretion in calculating his income for purposes of awarding child and spousal support. He contends the court erroneously "double counted" his bonus income.

{¶ 48} Spousal support is intended to provide for the financial needs of the ex-spouse and not necessarily to equalize the parties' income after divorce. *Moell v. Moell*, 98 Ohio App.3d 748, 751, 649 N.E.2d 880 (6th Dist.1994); *see also Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 23 ("Although there is no prohibition against the equalization of incomes in appropriate cases, income equalization is not a factor that must be considered under R.C. 3105.18(C)(1)."). The goal of spousal support is to reach an equitable result. *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 96, 518 N.E.2d 1197 (1988).

{¶ 49} In determining the amount and duration of spousal support, the trial court must consider the factors listed in R.C. 3105.18(C). *Deacon v. Deacon*, 8th Dist. Cuyahoga No. 91609, 2009-Ohio-2491, ¶ 57, citing *Kaechele* at 96. These factors include each party's income, earning capacity, age, retirement benefits, education, assets and liabilities, and physical, mental, and emotional condition, the duration of the marriage, their standard of living, inability to seek employment outside the home, contributions during the marriage, tax consequences, and lost income due to a party's fulfillment of marital responsibilities. R.C. 3105.18(C)(1)(a)-(m).

{¶ 50} "Child support, as a 'court-ordered payment,' is a relevant factor in determining spousal support. R.C. 3105.18(C)(1)(i)." *Ervin v. Ervin*, 4th Dist. Scioto No. 02CA2850, 2003-Ohio-3517, ¶ 19. The trial court is also free to consider any other factor that the court finds to be "relevant and equitable." R.C. 3105.18(C)(1)(n). Although the court need not expressly comment on each statutory factor it considered, it must indicate the basis for an award of spousal support in sufficient detail to enable a reviewing court to determine that the award is fair, equitable, and in accordance with the law. *Kaechele* at 96.

{¶ 51} When issuing an order of child support, the trial court must calculate the amount of support "in accordance with the basic child support schedule, the applicable worksheet, and the other provisions of Chapter 3119." R.C. 3119.02. However, where the combined income of the parties exceeds $150,000, the child support schedule does not apply, and the court must consider the standard of living

of the children and parents, who are the subject of the child support order. R.C. 3119.04.

{¶ 52} The judgment entry of divorce ordered Husband to pay $10,600 per month in spousal support and $3,824 as child support based on his base salary, plus 50% of Husband's bonus income. Husband's base salary is $251,000 per year. Half of $251,000 is $125,000. The award of $172,000 is 68.5% of $251,000. Therefore, the court's support order requiring Husband to pay Wife 68.5% of his base salary plus 50% of his bonus income is not equitable and constitutes an abuse of discretion.

{¶ 53} The second assignment of error is sustained.

## D. Marital Home

{¶ 54} In the third assignment of error, Husband argues the trial court erred and abused its discretion when it determined the value of the parties' marital residence. He contends the court's valuation of the property was not based on facts or evidence presented at trial.

{¶ 55} The parties' marital residence was located on Avalon Drive in Rocky River, Ohio. Wife presented evidence indicating that the marital home was valued at $1,000,000.00, when it was appraised in June 2019. Husband's appraiser testified that the marital residence had a value of $1,300,000.00 as of April 17, 2023, approximately one month before trial. The trial court rejected Wife's appraisal on grounds that it was out-of-date. Although Husband's appraiser, Charles W. Flagg ("Flagg"), completed his appraisal one month before trial, the court disregarded it because Flagg did not inspect the interior of the home. Nevertheless, the trial court

concluded that the parties' marital home was worth $1,150,000. (Judgment entry of divorce p. 10.)

{¶ 56} Trial courts have discretion to determine the value of property, but its valuation must be based on evidence. *McCoy v. McCoy*, 91 Ohio App.3d 570, 578, 632 N.E.2d 1358 (8th Dist.1993). "To achieve a middle of the road estimation without some basis for such an adjustment from one extreme or the other would constitute error as not being supported by the evidence." *Id.*

{¶ 57} The trial court rejected Flagg's appraisal even though he appraised the house one month before trial because he did not inspect the interior of the home. The judgment entry of divorce states in reaching its valuation of the home, the trial court considered "current market trends" and "a review of comparable real estate in the area of the marital residence." However, like Flagg, the court did not inspect the interior of the home and the court provides no explanation as to why its valuation is superior to Flagg's, especially when Flagg is an appraiser and the trial court is not.

{¶ 58} Moreover, a trial court has no authority to consider evidence outside the record and or to conduct its own investigation of the facts. *State v. Bayliff*, 3d Dist. Auglaize No. 2-10-08, 2010-Ohio-3944, ¶ 27, citing *State v. Mattox*, 8 Ohio App.2d 65, 220 N.E.2d 708 (10th Dist.1966); *State v. Denoon*, 8 Ohio App.2d 70, 220 N.E.2d 730 (10th Dist.1966). The trial court abused its discretion by disregarding the expert appraisal evidence in favor of its own independent investigation.

{¶ 59} The third assignment of error is sustained.

## E.  Temporary Support

{¶ 60} In the fourth assignment of error, Husband argues the trial court erred and abused its discretion in awarding temporary support.  He contends the trial court counted his income twice, which resulted in an unfair temporary support obligation.

{¶ 61} As previously stated, the November 18, 2019 temporary support order found that Husband's income for support purposes was $876,423.56.  This number included Husband's base salary of $251,336, plus his bonus income.  The temporary support order required Husband to pay $8,000 per month in temporary spousal support, $3,115.13 per month in temporary child support, $500 per month in temporary support arrears, the mortgage on the marital residence in the amount of $843.13 per month, and the utilities and property taxes associated with the New York vacation home in the amount of $2,300 per month.  The total temporary support order required Husband to pay Wife $14,757.26 per month or $177,087.12 per year.

{¶ 62} After subtracting the total support amount of $177,087.12 from Husband's pre-tax, base salary of $251,336, Husband was left with $74,248.88, with which to pay his own expenses and the parties' joint income tax liabilities.  And when Husband was unable to make support payments because the support obligations exceeded his net pay, the court ordered the support payments to be made from the restrained bonus income held in escrow in counsel's IOLTA accounts.

{¶ 63} Husband deposited his take-home pay into the Chase bank account he opened after commencement of the divorce proceedings. In its judgment entry of divorce, the trial court treated the Chase account as a marital asset and ordered Husband to pay Wife half the sum of $94,827.40, which represented the balance in the Chase account as of January 20, 2023. (Judgment entry of divorce p. 11.).

{¶ 64} However, not all the money in the Chase account can be fairly characterized as marital property. By requiring Husband to pay Wife more than half of his pre-tax, base salary while simultaneously restraining his bonus income, the court made it difficult for Husband to comply with the temporary support order. And, by requiring temporary support payments to be made exclusively from the restrained bonus income instead of equally from both sources of income, the trial court made it difficult to distinguish between the marital funds to be factored into spousal support and after-support funds that Husband was entitled to keep. Some or all of the money in the Chase checking account is after-support income that may be commingled with marital funds depending on the outcome of an equitable temporary spousal support calculation.

{¶ 65} Equity dictates that Wife could receive up to 50% of Husband's income, not more. To properly account for the funds each party was entitled to, the court should have divided Husband's entire income equally (i.e, half of the net base salary and net of the bonus income) instead of awarding Wife more than half of Husband's pre-tax, base salary plus 50% of his restrained bonus income, but then

paying the support obligation from the restrained funds. We, therefore, find that the trial court abused its discretion in awarding temporary support.

{¶ 66} The fourth assignment of error is sustained.

## F. Attorney Fees

{¶ 67} In the fifth assignment of error, Husband argues the trial court erred and abused its discretion in ordering Husband to pay $110,000 in attorney fees to Wife's lawyer.

{¶ 68} There are "no automatic attorney fees" in domestic relations cases. *Packard v. Mayer-Packard*, 8th Dist. Cuyahoga No. 85189, 2005-Ohio-4392, ¶ 8. However, a trial court "may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." R.C. 3105.73(A). In determining whether an award of attorney fees is equitable, R.C. 3105.73(A) directs the court to "consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate." R.C. 3105.73(A).

{¶ 69} Husband argues the award of attorney fees was an abuse of discretion because Wife received half of the marital estate, he did not have a superior financial ability to pay the fees, and there was nothing in the record indicating that he caused Wife to incur an increase in attorney fees. Wife, on the other hand, contends that Husband failed to accurately disclose his assets and income and violated restraining orders and temporary support orders, which necessitated the filing of additional motions to protect the marital estate while the case was pending. However, Wife

does not cite any evidence in the transcript or in the record to support these claims as required by App.R. 16(B) and 16(A)(3).

{¶ 70} Nevertheless, it is true that Wife filed several motions to show cause for nonpayment of temporary support in 2019 and 2020 and February and April, 2021. These motions were duplicative and accused Husband of failing to pay temporary support in violation of the court November 18, 2019 temporary support order. On May 6, 2021, the trial court found that Husband had a temporary support arrearage of $67,059.32, and ordered that the arrearage be paid from his restrained bonus income.

{¶ 71} However, as previously stated, Husband filed several motions before May 2021, asking the court to release his restrained bonus income because he was unable to meet his support obligations based on his base salary alone. Husband explained in a motion to release restrained bonus income, filed March 4, 2021:

> On November 18, 2019, the Court issued a Temporary Support Order that established [Husband]'s support obligation based upon an income of $876,423.56, even though all but $250,000 of [Husband]'s 2019 wages were restrained and therefore unavailable to satisfy any support obligation.

The trial court never ruled on this motion. In his April 24, 2021 brief in opposition to Wife's motion to show cause, Husband reiterated:

> [Husband] cannot be held in contempt when it is impossible for him to comply with the Magistrate's Order of Temporary Support dated November 18, 2019. When the court granted Plaintiff's motions for ex parte restraining orders and impermissibly restrained his employer Fifth [Third] Bank from paying to [Husband] the income upon which the court's temporary support order was based, it became impossible for him to comply with that temporary support order. The two

discretionary and non-discretionary bonuses that [Husband] earned are needed to satisfy the temporary support order and to allow him to pay his own expenses. Indeed, the pre-tax portion of the restrained funds (his discretionary and non-discretionary bonuses) represent 70% of [Husband]'s 2021 income, without which Husband cannot satisfy the temporary support order.

{¶ 72} The record supports Husband's assertions. The November 18, 2019 temporary support order was based on Husband's total income of $876,423.56, which was comprised of a base salary of $251,326.40 and $625,087.56 in bonus income. When the trial court restrained his bonus income, Husband was left with only his pre-tax, base salary of $251,326.40 to pay his support obligation of $177,000 per year. Husband is taxed at a rate of 40%. Thus, even if Wife received all of Husband's after-tax income, he would still be in arrears of the support obligation, and he would have nothing with which to support himself and the child who was living with him at the time of the parties' separation. Husband should not have been charged with misconduct for failing to pay temporary support when the court's order made it impossible for him to comply.

{¶ 73} Furthermore, there is nothing in the record to suggest that Husband failed to cooperate in discovery and no contempt motions were filed against Husband for failure to comply with discovery. Wife had more than sufficient resources to pay her own attorney fees since she received temporary spousal support, spousal support, and half of the marital estate. Therefore, the trial court's order requiring Husband to pay Husband's attorney fees was an abuse of discretion.

{¶ 74} The fifth assignment of error is sustained.

## G. Loan from Wife's Parents

{¶ 75} In the sixth assignment of error, Husband argues the trial court erred and abused its discretion when it determined that Wife's "non-descript" loan in the amount of $45,000 from her parents was marital property even though the funds were used to pay tuition for the parties' emancipated children.

{¶ 76} A trial court must take into account the parties' marital debt when dividing marital property. *Chattree v. Chattree*, 2014-Ohio-489, 8 N.E.3d 390, ¶ 8 (8th Dist.), citing *Kehoe v. Kehoe*, 2012-Ohio-3357, 974 N.E.2d 1229, ¶ 14 (8th Dist.). "Marital debt" is "'debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose.'" *Cross v. Cross*, 8th Dist. Cuyahoga No. 2015-Ohio-5255, ¶ 30, quoting *Ketchum v. Ketchum*, 7th Dist. Columbiana No. 2001 CO 60, 2003-Ohio-2559, ¶ 47, citing Turner, *Equitable Division of Property*, Section 6.29, 455 (2d Ed.1994, Supp. 2002). "Debt that is not for the joint benefit of the parties is considered nonmarital and 'equity generally requires that the burden of nonmarital debts be placed upon the party responsible for them.'" *Id.*, quoting *Minges v. Minges*, 12th Dist. Butler No. CA87-06-085, 1988 Ohio App. LEXIS 660 (Feb. 29, 1988).

{¶ 77} Debts accumulated during the marriage are presumed to be marital debts. *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 62, citing *Cooper v. Cooper*, 12th Dist. Clermont No. CA2013-02-017, 2013-Ohio-4433, ¶ 18. Therefore, the party seeking to have the debt classified as a separate debt bears the burden of proving, by a preponderance of the evidence, that the debt was

the separate obligation of the other spouse or was not for a valid marital purpose. *Id.*

{¶ 78} Wife testified at trial that she borrowed money from her parents to pay real estate taxes on the parties' marital home and to pay tuitions for two of her emancipated children who were in college. (Tr. 38.) Wife stated that she borrowed $12,000 from her parents to pay the real estate taxes on the marital home before receiving any spousal support. (Tr. 38.) She also stated that she made college tuition payments of various amounts at different times for two adult children. (Tr. 38.) When asked how much she owed her parents, she replied, "I would say $45,000 probably." (Tr. 28.)

{¶ 79} Pursuant to the November 18, 2018 temporary support order, Wife was responsible for the real estate taxes on the marital home. Husband was assigned other responsibilities such as paying the mortgage on the marital home and the expenses associated with the parties' New York vacation home. Therefore, because Husband was not responsible for the real estate taxes, he is not required to repay a loan for that expense, especially since Wife ultimately received temporary spousal support that included an arrearage for the period of time when she was not yet receiving support.

{¶ 80} And, paying tuition for the parties' adult children is not a valid "marital purpose" since a parent's duty to support a child ends when the child reaches 18 years old. *Castle v. Castle*, 15 Ohio St.3d 279, 282, 473 N.E.2d 803 (1984); *Dudziak v. Dudziak*, 81 Ohio App.3d 361, 611 N.E.2d 337 (8th Dist.1992);

R.C. 3103.03. Indeed, a court lacks jurisdiction to order a parent to support a child once that child reaches the age of majority. *In re W.W.*, 8th Dist. Cuyahoga No. 98784, 2013-Ohio-827, ¶ 12. *See also Gallo v. Gallo*, 11th Dist. Lake No. 2000-L-208, 2002-Ohio-2815. In *Gallo*, the court held that a wife could not be held liable for a loan obtained by husband to pay for an emancipated child's education. *Id*. at ¶ 31-33.

{¶ 81} Therefore, the trial court erred and abused its discretion by classifying Wife's loan from her parents as a marital debt and ordering Husband to pay half of it.

{¶ 82} The sixth assignment of error is sustained.

## H. Lapsed Insurance Policy

{¶ 83} In the seventh assignment of error, Husband argues the trial court erred and abused its discretion in granting Wife ownership of a life insurance policy issued by Northwestern Mutual. He contends there was no basis for awarding the insurance policy to Wife because the policy expired in March 2023, two months before the divorce trial.

{¶ 84} The judgment entry of divorce provides, in relevant part:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff shall be the owner and sole beneficiary of Defendant's Northwestern Mutual life insurance policy with a total death benefit of Five Hundred Thousand Dollars ($500,000). Defendant shall pay all premiums on the life insurance policy until he no longer has a support or property division obligation.

The parties stipulated to the admission into evidence of defendant's exhibit U. Defendant's exhibit U contains a life insurance annual policy statement from Northwestern Mutual indicating that the policy expired and coverage ended on March 5, 2023. Therefore, there was no life insurance policy from Northwestern Mutual in existence to award to Wife in the divorce.

{¶ 85} Furthermore, "[a] trial court may not secure a spousal support order with life insurance, unless the order specifically states that the spousal support continues after the death of the obligor." *Hoopes v. Hoopes*, 8th Dist. Cuyahoga No. 106855, 2018-Ohio-5232, ¶ 18, citing *Janosek v. Janosek*, 8th Dist. Cuyahoga Nos. 86771 and 86777, 2007-Ohio-68, ¶ 10, citing *Waller v. Waller*, 163 Ohio App.3d 303, 2005-Ohio-4891, 837 N.E.2d 843 (7th Dist.).

{¶ 86} The judgment entry of divorce provides that Husband shall pay spousal support "until further order of this Court." However, it also states that "all payments shall terminate upon the death of either party[.]" Therefore, because the Northwestern Mutual life insurance policy expired prior to trial and the support order does not extend until after Husband's death, the court had no authority to require Husband to provide life insurance for Wife's benefit.

{¶ 87} Therefore, the seventh assignment of error is sustained.

## I. Proposed Shared Parenting Plan

{¶ 88} In the eighth assignment of error, Husband argues the trial court erred and abused its discretion by not adopting his proposed shared parenting plan. He contends the court abused its discretion by reducing his parenting time.

{¶ 89} At trial, Husband asked to maintain the shared parenting arrangement the parties applied during the pendency of the litigation. Husband filed a motion to adopt a shared parenting plan on July 24, 2020, but the trial court never ruled on it. Nevertheless, the parties voluntarily shared parenting, according to the schedule in exhibit No. 1 attached to Husband's motion ("proposed shared parenting plan"), until the court issued the final judgment entry of divorce. (Tr. 102; Defendant's Motion to Adopt Shared Parenting.).

{¶ 90} Under the proposed shared parenting plan, Husband had visitation with his son, C.E., every other weekend from Thursday through Sunday evening and dinner on Thursday nights when it was not Husband's weekend with the child. Under the proposed shared parenting plan, the parties also took turns having C.E. for holidays throughout the year. With respect to C.E.'s spring break and Christmas break, Husband had visitation with C.E. for his entire spring break, every other year, and half of his winter break, alternating between the first half of the break and the second half of the break each year. For Monday holidays, such as Martin Luther King Day, the parties took turns having C.E. for the entire long weekend and not just the Monday holiday. Husband exercised his right to visitation according to the proposed shared parenting plan during the litigation except when his work required him to travel, and he wanted to continue with the same arrangement.

{¶ 91} In the judgment entry of divorce, the trial court designated Wife the residential parent and legal custodian of C.E. and reduced Husband's parenting time. Instead of visiting from Thursday to Sunday evening on alternating weekends,

the court's order grants Husband visitation from Friday after school until Sunday at 6:00 p.m. The court's order further provides that Husband "shall also be entitled to holiday time and days of special meaning in accordance with this Court's standard schedule." The court's standard schedule does not allow Husband to have C.E. for spring break; it only allows visitation on Easter Sunday every other year. It does not allow Husband to have half of winter break; it only allows Husband to visit on either Christmas Eve or Christmas Day, alternating each year. The trial court determined that reducing Husband's parenting time was in the child's best interest.

{¶ 92} R.C. 3109.04 governs the allocation of parental rights and requires a court to consider the best interest of the child. R.C. 3109.04(A). In determining which parenting arrangement serves the child's best interest, the court must consider the following "best interest factors":

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1).

{¶ 93} Wife testified at trial that C.E. had been bedwetting. She also recently discovered that C.E. had a vitamin D deficiency. She claimed that Husband did not take these conditions seriously and that she could not co-parent with him because she could not communicate with him. (Tr. 29-30.)

{¶ 94} Husband testified that he takes an active role in parenting his children. He coached two of his son's basketball teams and coached his daughter's soccer team. (Tr. 79.) Regarding C.E.'s recently diagnosed vitamin D deficiency, Husband stated that he would include vitamin D rich foods in his diet and make sure he gets plenty of sunshine. He had only recently learned of the bedwetting and suggested to Wife that maybe she was mistaking "wet dreams" for bedwetting because he is 14 years old, and he never wet the bed at Husband's house. (Tr. 103.)

{¶ 95} In deciding it was best for C.E. to spend less time with Husband, the court found that Husband did not exercise all the parenting time available to him during the litigation, he failed to pay his child support obligations, and the parents are unable to make joint decisions concerning the minor child. (Judgment entry of divorce p. 15.)

{¶ 96} The record shows that Husband visited with C.E. as much as possible, but he occasionally missed visits because he was required to travel for work. There is no evidence that he missed a visit due to lack of affection for the child. And, as previously explained, Husband repeatedly asked the court to release bonus money in order to help him pay his support obligations. There was also no evidence that Husband was unwilling to pay child support. Rather, Husband had difficulty meeting all of his financial obligations due to the court's repressive restraining orders. And both parties are responsible for their ineffective communications. Moreover, the reduced parenting time does not reduce the parties' communication because the court's order does not reduce the number of visits; it only reduces the

length of the visits and all communications could continue through Our Family Wizard as before.

{¶ 97} The evidence showed that Husband loves his son and wishes to spend time with him. Unfortunately, there is no evidence of C.E.'s preference with regard to shared parenting because C.E. did not testify at trial and he was not represented by a guardian ad litem, who could speak on his behalf. Although Wife testified that C.E. had recently begun bedwetting, which may be a symptom of anxiety, it is not surprising that the child might feel some anxiety since his parents were in the midst of divorce and Wife recently had an adverse reaction to an antibiotic that affected her ability to walk. (Tr. 32.) Moreover, Husband only just learned that C.E. was bedwetting and he did not have sufficient time to adequately assess the issue for himself before testifying at trial. He nevertheless indicated he would monitor C.E's behavior and health. We find the reduction in Husband's parenting time was an abuse of discretion under these circumstances.

{¶ 98} The eighth assignment of error is sustained.

### J. Missing Funds

{¶ 99} In the ninth assignment of error, Husband argues the trial court erred in failing to account for funds missing from Wife's lawyer's IOLTA account. Husband asserts that plaintiff's exhibit No. 79 "shows that $11,225.13 was sent by Wife's counsel to OCSS on June 20, 2022, and was sent to 'other.'" He further asserts that "[t]his amount was not sent to either party and the trial court did not address these missing funds in the Judgment Entry of Divorce." However, plaintiff's

exhibit No. 79 does not list any transactions occurring on June 20, 2022, and there is no transaction listed in plaintiff's exhibit No. 79, indicating that the funds were sent to "other."

{¶ 100} Husband also cites plaintiff's exhibit No. 72(B) in support of his claim for missing funds. In plaintiff's exhibit No. 72(B), there is a transaction dated July 7, 2022, indicating that funds in the amount of $11,225.13 were sent to "other." It is unclear who "other" represents. It is, therefore, unclear whether these funds were delivered to the appropriate party. We, therefore, sustain the ninth assignment of error.

## K. Continuing Restraining Orders

{¶ 101} In the tenth assignment of error, Husband argues the trial court erred and abused its discretion by leaving restraining orders in effect and not dismissing the third-party defendant.

> In a domestic relations action, a temporary restraining order merges within the final decree, and the right to enforce the order does not extend beyond the decree, unless it has been reduced to a separate judgment or unless it has been considered by the trial court and specifically referred to within the decree.

*Brown v. Brown*, 2014-Ohio-2402, 14 N.E.3d 404, ¶ 71 (8th Dist.), citing *O'Brien v. O'Brien*, 8th Dist. Cuyahoga No. 89615, 2008-Ohio-1098, ¶ 83-88. *See also Stratton v. Stratton*, 8th Dist. Cuyahoga No. 107798, 2019-Ohio-3279, ¶ 22-24.

{¶ 102} A docket entry dated June 9, 2023 states, in relevant part: "It is further ordered that all restraining orders previously issued by this court are hereby dissolved and set aside. O.S.J." This language indicates the trial court dissolved all

the restraining orders.  However, the "O.S.J." language directs us to the journal, which in this instance refers to the judgment entry of divorce.  The judgment entry of divorce states, in part:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all restraining orders previously issued by this Court on the assets and accounts of the parties shall not be released until all property has been divided as set forth herein.

The language in the judgment entry of divorce conflicts with the language on the docket.  The language in the judgment entry of divorce also fails to reference any specific restraining order.  Instead, it blanketly refers to "all restraining orders." That is, the judgment entry of divorce does not identify the restrained parties nor does it identify the restrained items.  Therefore, the trial court erred in issuing an order to continue all unidentified restraining orders.

{¶ 103} The tenth assignment of error is sustained.

{¶ 104} The trial court judgment's is reversed and the case is remanded to (1) vacate the distributive award to Wife in the amount of $500,000; (2) recalculate spousal and child support and temporary child and spousal support to make the awards equitable and adjust, if necessary, the division of marital property such as Husband's Chase account in accordance with this opinion, (3) vacate the award of attorney fees to Wife, (4) adopt Flagg's appraisal of the marital property as the value of the property, (5) order Wife to be solely responsible for the loan from her parents, (6) vacate the order granting Wife ownership of the Northwestern Mutual Insurance policy, (7) maintain the proposed shared parenting plan set forth in exhibit No. 1,

attached to "Defendant's motion to adopt shared parenting" filed on July 24, 2020, (8) account for one payment made on July 7, 2022, from Wife's lawyer's IOLTA account in the amount of $11,225.13 as reflected in plaintiff's exhibit No. 72(B); and (9) vacate all restraining orders.

{¶ 105} On remand, the trial court shall calculate the amount Wife should have received instead of the amount she actually received and adjust the payment of temporary support accordingly. The trial court may award Wife some of the funds in the Chase account, but only if she has not yet received half of Husband's total income during the relevant period of time for purposes of temporary support. Because Wife received more than half of Husband's base salary as temporary support and there were no arrearages at the time of trial, it is more likely the case that Wife received an overpayment of temporary spousal support.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR